

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-148-CV

NANCY BENISH, R.N., F.N.P.-C.;                    APPELLANTS
CHRISTINE LASHELL HOPSON, R.N.;
AND LEONARD T. DINGLER, M.D.

V.

AMANDA GROTTIE, INDIVIDUALLY                     APPELLEES
AND AS HEIR TO AND
REPRESENTATIVE OF THE ESTATE
OF AMARISSA GROTTIE, DECEASED,
AND CODY GROTTIE, INDIVIDUALLY
AND AS HEIR TO AND REPRESENTATIVE
OF THE ESTATE OF AMARISSA GROTTIE,
DECEASED

------------

FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY

------------

## OPINION

------------

## I. INTRODUCTION

This is an interlocutory appeal in a medical negligence suit challenging the trial court's order denying motions to dismiss filed by Appellants Nancy Benish, R.N., F.N.P.-C; Christine Lashell Hopson, R.N.; and Leonard T. Dingler, M.D. Because Appellees Amanda Grottie, individually and as heir to and representative of the estate of Amarissa Grottie, deceased, and Cody Grottie, individually and as heir to and representative of the estate of Amarissa Grottie, deceased, timely filed adequate expert reports, the trial court did not abuse its discretion by overruling Appellants' objections to the reports or by denying Appellants' motions to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (Vernon Supp. 2008). Accordingly, we will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Amanda and Cody Grottie filed suit against Appellants after their twenty-two-month-old baby Amarissa Grottie died. The Grotties alleged that they took Amarissa to the emergency room at Nocona General Hospital, where she was negligently treated and discharged by Appellants. Amarissa died twelve hours after discharge.

After filing suit, the Grotties timely filed an eleven-page, single-spaced expert report by Craig A. Kennedy, M.D., FACEP, FAAEM, along with his twenty-page, single-spaced curriculum vitae. The Grotties also timely filed a

2

nine-page, single-spaced expert report by Nancy Cleveland, R.N., M.S.N., FNP-BC, along with her two-page curriculum vitae.

Appellants each filed objections to both reports, and Nurse Benish and Dr. Dingler filed motions to dismiss.[1] Appellants claimed in the trial court, and assert on appeal,[2] that Dr. Kennedy's and Nurse Cleveland's reports are inadequate. All Appellants claim that both Dr. Kennedy's and Nurse Cleveland's reports are inadequate because they fail to couch the standard of care violations discussed in the reports in terms of "wilful and wanton negligence," which Appellants claim is required by civil practice and remedies code section 74.153. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.153 (Vernon 2005). Dr. Dingler claims that Dr. Kennedy's report is inadequate because it purportedly makes only conclusory and inadequate allegations concerning Dr. Dingler's standard of care violations and causation. Nurse Benish claims that Dr. Kennedy's report is inadequate because it makes only conclusory causation opinions as to her alleged negligence. Dr. Dingler and Nurse Hopson claim that Dr. Kennedy is not

---

[1] Nurse Hopson filed objections but did not file a motion seeking dismissal. Nonetheless, the trial court's order expressly refused to dismiss the claims against her and she perfected an appeal, so we will address her issues.

[2] Dr. Dingler and Nurse Hopson filed a joint brief on appeal. Some contentions in Dr. Dingler and Nurse Hopson's brief apply to both of them, and some apply only to Dr. Dingler or only to Nurse Hopson. We refer to their brief on the basis of to whom the argument applies. Nurse Benish filed a separate brief.

qualified to opine on causation. And finally, all Appellants claim that Nurse Cleveland was not qualified to render a causation opinion.[3] After a hearing, the trial court overruled Appellants' objections and denied their motions to dismiss. This appeal followed.[4]

### III. STANDARD OF REVIEW

We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 290–91 (Tex. App.—Fort Worth 2008, pet. filed); *Maris v. Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar

---

[3] Dr. Dingler and Nurse Hopson's brief raises one issue but asserts four subissues and numerous arguments within each subissue. Nurse Benish's brief raises three issues.

[4] *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (authorizing appeal from trial court order determining that expert report was adequate and denying motion to dismiss).

4

circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. But a trial court has no discretion in determining what the law is or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Ehrlich v. Miles*, 144 S.W.3d 620, 624 (Tex. App.—Fort Worth 2004, pet. denied).

## IV. FAILURE TO OPINE THAT APPELLANTS ACTED "WILFULLY AND WANTONLY" DOES NOT RENDER THE REPORTS INADEQUATE

Appellants argue that Dr. Kennedy's and Nurse Cleveland's reports are inadequate because the Grotties' claims "are 'emergency medical care' claims governed by section 74.153 of the civil practice and remedies code" and that, consequently, in order to be adequate, any expert report must opine that Appellants acted wilfully and wantonly. The Grotties respond first that Appellants did not provide emergency medical care and second that section 74.153 is not applicable to section 74.351 expert reports. We need not determine, however, whether Appellants provided emergency medical care to Amarissa; the plain language of section 74.153 of the statute defeats Appellants' argument.[5]

---

[5] Because we do not decide whether Appellants provided emergency medical care, we do not address the portions of Dr. Dingler and Nurse Hopson's subissues arguing that Amarissa was not "stable" when she arrived at the

5

Texas Civil Practice and Remedies Code section 74.153 is titled "Standard of Proof in Cases Involving Emergency Medical Care" and provides as follows:

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department . . . the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider deviated from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem. Code Ann. § 74.153. Thus, the statute sets forth the *standard of proof* at trial that is required in a health care liability claim arising out of the provision of emergency medical care. *See id*. An expert report, however, is statutorily required to provide only a summary of the expert's opinions regarding the applicable *standards of care*, the manner in which the defendant's conduct did not meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id*. § 74.351(r)(6).

---

emergency room on the day of her death; we likewise need not address the Grotties' argument that the wilful and wanton negligence standard of proof is an affirmative defense or a plea in avoidance that Appellants waived by not pleading.

Section 74.153's statutorily created *standard of proof* and the applicable *medical standards of care* are not the same thing. *See Bosch v. Wilbarger Gen. Hosp*., 223 S.W.3d 460, 464 (Tex. App.—Amarillo 2006, pet. denied) (holding that "[a]s used in the context of medical malpractice actions, the phrases 'standard of care' and 'standard of proof' are not synonymous" and rejecting the argument that section 74.153 requires an expert to speculate in his report as to whether a physician's negligence was wilful and wanton). In a medical negligence cause of action, the plaintiff must prove by competent testimony that the defendant's negligence proximately caused the plaintiff's injury; to do so, the plaintiff must prove four elements: (1) a duty by the physician to act according to a certain standard, (2) breach of the applicable standard of care, (3) an injury, and (4) a sufficient causal connection between the breach of the standard and the injury. *See Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965). Thus, the medical standard of care is an element of a plaintiff's medical negligence cause of action, setting the standard against which the factfinder measures the defendant's conduct. *See, e.g.*, *Coan v. Winters*, 646 S.W.2d 655, 657 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.) (recognizing that "[t]he medical standard of care is the threshold question in a medical malpractice case and must be established so that the fact finder can determine whether the doctor's

7

act or omission deviated from the standard of care to the degree that it constituted negligence or malpractice").

Conversely, the standard of proof imposed by section 74.153 requires proof—that is, evidence at trial that will more than likely be circumstantial—that the physician or health care provider's mental state or intent at the time of any deviation from the medical standard of care was wilful and wanton. *See* Tex. Civ. Prac. & Rem. Code § 74.153; *accord Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (explaining requirements of gross negligence may be proved by circumstantial evidence). The Texas Supreme Court has explained repeatedly that it is a tortfeasor's intent or mental state that distinguishes between negligence, gross negligence, knowing acts or omissions, wilful negligence, and intentional conduct. *See, e.g., Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 164 (Tex. 2005) ("What separates ordinary negligence from gross negligence is the defendant's state of mind."); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004) ("[I]t is the defendant's state of mind[—]whether the defendant knew about a peril but nevertheless acted in a way that demonstrated that he did not care about the consequences[—]that separates ordinary negligence from gross negligence."); *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246 (Tex. 1999) (same); *St. Paul Surplus Lines v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998)

8

(recognizing a culpability continuum of gross negligence, knowingly, wilful, and intentional, with gross negligence being the lowest mental state); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 263 (Tex. 2008) (holding that "[i]n this case, the record fails to show the required clear and convincing evidence of a state of mind so indifferent to peril as to elevate the hospital's conduct from negligence to gross negligence").

Dr. Dingler and Nurse Hopson assert in their reply brief that section 74.153's wilful and wanton negligence standard of proof "is synonymous with gross negligence." Assuming Appellants are correct, they have not cited, and we have not located, any authority for the proposition that to prevent dismissal of a gross negligence pleading in a health care liability claim, a statutory expert report must offer an opinion that a health care provider's act or omission—when viewed objectively from the standpoint of the actor at the time of its occurrence—"involve[d] an extreme degree of risk, considering the probability and magnitude of the potential harm to others," and that the health care provider had "actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (Vernon 2008) (setting forth the definition of "gross negligence"). Indeed, in light of the limited discovery permitted before an expert report is filed and in light of the

9

proof necessary to establish a health care provider's objective understanding of a risk and his subjective disregard of that risk, it is doubtful that an expert preparing a section 74.351 report would ever be able to offer an opinion that a health care provider acted with the requisite state of mind to establish gross negligence or wilful and wanton negligence. *See id.* § 74.351(s), (u) (authorizing only limited discovery before an expert report is filed); *Bosch*, 223 S.W.3d at 464 (explaining that in light of this limited discovery, an opinion set forth in a section 74.351 expert report concerning wilful and wanton negligence "would most likely be sheer speculation").

Although Dr. Dingler and Nurse Hopson urge us to equate wilful and wanton negligence with gross negligence, we decline to do so, and we do not purport here to construe the term "wilful and wanton negligence" as used in section 74.153; it appears that conflicting definitions may exist. *Compare St. Paul Surplus Lines*, 974 S.W.2d at 53 (setting forth culpability continuum), *with Dunlap v. Young*, 187 S.W.3d 828, 836 (Tex. App.—Texarkana 2006, no pet.) (equating wilful and wanton negligence with gross negligence), *and State v. Crawford*, 262 S.W.3d 532, 541 (Tex. App.—Austin 2008, no pet.) (explaining that "[t]he term 'willful' [sic] in a statute is 'a word of many meanings, its construction often being influenced by its context'" and quoting *Paddock v. Siemoneit*, 147 Tex. 571, 218 S.W.2d 428 (1949), which quotes *Spies v.*

10

*United States*, 317 U.S. 492, 497, 63 S. Ct. 364, 367 (1943)). We hold only that, whatever definition of wilful and wanton is utilized, section 74.153 requires proof at trial of a *mental state* or *state of mind* beyond mere negligence of the physician or health care provider at the time of the physician or health care provider's deviation from the medical standard of care. *See* Tex. Civ. Prac. & Rem. Code § 74.153.

Appellants nonetheless urge us to superimpose section 74.153's *standard of proof* requirements onto the expert report requirements codified in section 74.351(r)(6). But the rules of statutory construction prevent us from doing so. In construing a statute, our objective is to determine and give effect to the legislature's intent. *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 252–53 (Tex. App.—Dallas 2005, no pet.). If a statute's language is unambiguous, we generally interpret the statute according to its plain meaning. *Nauslar*, 170 S.W.3d at 253. We begin by examining the exact wording and apply the tenet that the legislature chooses its words carefully and means what it says. *See In re M.N.,* 262 S.W.3d at 802; *Nauslar*, 170 S.W.3d at 253. We determine legislative intent from the entire act and not just isolated portions. *Nauslar*, 170 S.W.3d at 253. In determining the meaning of a statute, a court must consider the entire act, its

11

nature and object, and the consequences that would follow from each construction. *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991); *see generally* Tex. Gov't Code Ann. §§ 311.001–.034 (Vernon 2005) (Code of Construction Act setting forth presumptions and matters to be considered in construing statute).

Here, the legislature made its intent in section 74.153 clear by carefully choosing the words "standard of proof" rather than "standard of care."  The legislature intended, as it stated in section 74.153, that a claimant "may prove" a departure from the standard of care in providing emergency medical care only if the claimant shows that the physician or health care provider "with wilful and wanton negligence" deviated from the standard of care.  Tex. Civ. Prac. & Rem. Code § 74.153.  Thus, the legislature prescribed a claimant's *burden of proof at trial* in a case involving emergency medical care.  *See Dill v. Fowler*, 255 S.W.3d 681, 684 (Tex. App.—Eastland 2008, no pet.) (couching the statutory language as a "standard of care" but applying it in a no-evidence summary judgment context as a burden of proof); *see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (holding that statutory expert report "need not marshal all the plaintiff's proof").  The plain language of section 74.153 does not purport to alter the medical standards of care applicable to emergency medical care.

12

Considering the entire act, we note that despite the enactment of section 74.153, the legislature did change section 74.351(r)(6), which sets forth the requirements of an expert report. The legislature could have added a sentence to section 74.351(r)(6) requiring an expert report in an emergency medical care case to opine that the physician or health care provider acted with wilful and wanton negligence. But the legislature did not do so, and nothing in the unambiguous language of section 74.153 indicates such an intent.[6] In fact, in subsection (j) of section 74.351, the legislature expressly forbid the imposition of extra requirements on expert reports; the legislature provided, "Nothing in this section [section 74] shall be construed to require the serving of an expert report regarding any issue [i.e., here, a wilful and wanton mental state] other than an issue relating to liability or causation." Tex. Civ. Prac. & Rem. Code Ann. 74.351(j). Nothing in our review of the entire act indicates that the

---

[6] Dr. Dingler urges us to apply "the doctrine of last antecedent" to hold that the phrase "wilful and wanton negligence" as used in section 74.153 modifies "deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances." Applying the doctrine of last antecedent, however, does not alter the plain language of section 74.153; the statute, even applying the doctrine of the last antecedent, sets forth a *standard of proof* for a health care provider's intent or mental state that is applicable *at trial* but does not alter the medical standards of care that an expert must set forth in an expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r).

legislature intended section 74.153 to alter the expert report requirements it set forth in section 74.351(r)(6).

And finally, as we have already alluded to, Appellants' construction of section 74.153 would have the absurd consequence of requiring a claimant to obtain an expert opinion on a physician's or health care provider's mental state at the time he or she was negligent after reviewing only very limited discovery. *See* Tex. Gov't Code Ann. § 311.023(5) (recognizing that consequences of particular construction may be considered in construing statute); Tex. Civ. Prac. & Rem. Code Ann. § 74.351(s), (u) (authorizing only limited discovery before an expert report is filed); *Bosch*, 223 S.W.3d at 464 (explaining impossibility of obtaining such an opinion in light of statutorily limited discovery).

For these reasons, we decline Appellants' request that we judicially rewrite the statute to superimpose section 74.153's wilful and wanton standard of proof at trial upon the criteria for expert reports set forth by the legislature in section 74.351(r)(6). We hold that the trial court did not abuse its discretion by overruling Appellants' objections asserting that Dr. Kennedy's and Nurse Cleveland's reports were inadequate because they did not offer opinions that Appellants' standard of care violations—outlined and discussed in the reports—were performed wilfully and wantonly. We likewise hold that the trial court did not abuse its discretion by denying Appellants' motion to dismiss on

14

this basis.  We overrule Dr. Dingler and Nurse Hopson's subissues 1(a), 1(b), and the first portion of their subissue 1(c).[7]  We also overrule Nurse Benish's issue 2.

## V.  THE EXPERT REPORTS ARE ADEQUATE

A trial court must grant a motion to dismiss based on the alleged inadequacy of an expert report only if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*).  An expert report "need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878 (construing former art. 4590i, § 13.01).  It must simply provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

---

[7] The joint brief filed by Dr. Dingler and Nurse Hopson contains no arguments challenging any substantive aspect of Dr. Kennedy's or Nurse Cleveland's reports concerning Nurse Hopson except based on the wilful and wanton negligence issue; Nurse Hopson does join Dr. Dingler's arguments that neither Dr. Kennedy nor Nurse Cleveland were qualified to testify on causation.

To constitute a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Id.* at 879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* The claimant's expert must incorporate enough information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude the claims are meritorious. *Id.*

When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Id.* at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See id*. However, section 74.351 does not prohibit *experts*, as opposed to courts, from making inferences based on medical history. *Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.); *see also* Tex. R.

16

Evid. 703 (providing that an expert may draw inferences from the facts or data in a particular case); Tex. R. Evid. 705 (providing that expert may testify in terms of opinions and inferences).

**A.  Dr. Kennedy's Opinions Concerning the Standard of Care Violations by Dr. Dingler**

Dr. Dingler argues that Dr. Kennedy did not explain how Dr. Dingler directly breached the standard of care for either an emergency medical care claim or a nonemergency medical care claim.  To the extent Dr. Dingler claims Dr. Kennedy was required to opine that Dr. Dingler acted wilfully and wantonly, we have overruled that contention as set forth above.  To the extent Dr. Dingler complains that Dr. Kennedy's report does not explain Dr. Dingler's breaches of a standard of care, we address this contention below.

Dr. Kennedy's report contains the following:

The standard of care for a physician who supervises mid-level practitioners (Nurse Practitioners and Physician Assistants) requires that the physician provide adequate supervision, training and monitoring to ensure that the Nurse Practitioner performs appropriate histories and physical examinations.  The standard of care requires the supervising physician to have a clear understanding and agreement regarding what methods of treatment the mid-level provider will use for common conditions such as gastroenteritis, vomiting, diarrhea and dehydration.  The standard of care requires the supervising physician to provide clear instructions (i.e. protocols) to confer with the supervising physician when the mid-level practitioner has a plan to discharge a patient without following the established and agreed upon methods of treatment.  Since the supervising physician is responsible for the

17

medical care that is rendered by the mid-level practitioner under his supervision, he must make sure that the mid-level provider has adequate education, training and experience to provide competent medical care.

The standard of care for a physician supervising a Nurse Practitioner who is treating a young child in the emergency department with a history of vomiting and diarrhea requires that the physician ensure that the Nurse Practitioner has obtained an adequate history.  This would include information regarding the duration, severity and quantity of the vomiting and diarrhea, and the order in which the symptoms developed, the presence or absence of fever, the consistency and content of stools, [and] the child's recent intake, appetite and ability to keep food and fluids down.  The standard of care requires that the physician ensure that the Nurse Practitioner conducted an appropriate physical examination of the child including assessment of mental status (including signs of lethargy or anxiety), a full set of vital signs, assessment of skin turgor (including whether mucous membranes are moist or dry and whether the eyes are sunken), a general assessment of the ears, throat, heart, lungs, abdomen and extremities and assessment of weight with a comparison of the child's usual weight.

The standard of care requires that [] when there is a significant decrease in the child's weight (i.e. over 6%) and the child appears ill, that a urine specific gravity or other serum studies (electrolytes, blood urea nitrogen and creatinine) be obtained to further clarify the child's actual fluid status.

The standard of care requires that children with moderate dehydration (6% to 9%) be kept in the ER (or another supervised setting such as a physician's office or urgent care center) to be given oral replacement therapy (ORT).  The dehydration is corrected by giving at least 60-120 ml/hr by mouth over approximately a four (4) hour period.  Following this therapy, the child's hydration should be reassessed.  The child should not be discharged from the ER until the oral hydration therapy has been successfully given.  If the oral replacement therapy is not successful due to intolerance to oral

intake or excessive continued losses, the child should be given IV fluids and evaluated for admission if necessary.

The standard of care requires that the supervising physician ensure that a Nurse Practitioner working under his supervision be aware that the administration of Benadryl or other medications that cause drowsiness are not indicated for the treatment of vomiting and diarrhea due to acute gastroenteritis.

The standard of care requires that the physician provide adequate training and supervision to ensure that the nurse practitioner knows how to provide adequate discharge instructions.

DEVIATIONS BY DR DINGLER:

It is my opinion that Dr. Dingler fell below the standard of care and was negligent by failing to provide adequate supervision of Nurse Practitioner Benish. Based upon the numerous deficiencies in Nurse Practitioner Benish's history and physical examination of Amarissa, it is clear that Dr. Dingler did not ensure that this Nurse Practitioner knew how to take an adequate history and physical examination. Since Nurse Practitioner Benish did not follow accepted protocols (i.e. administration of oral replacement therapy for moderate dehydration) to treat Amarissa, Dr. Dingler did not ensure that Nurse Practitioner Benish had adequate training and experience to diagnose and treat complications of acute gastroenteritis including dehydration.

Dr. Dingler fell below the standard of care and was negligent by failing to ensure that Nurse Practitioner Benish obtained an adequate history including the duration, severity and quantity of the vomiting and diarrhea, the order in which the symptoms developed, the presence or absence of fever, the consistency and content of stools and Amarissa's recent intake, appetite and ability to keep food and fluids down. Dr. Dingler fell below the standard of care and was negligent by failing to ensure that Nurse Practitioner Benish conducted an appropriate physical examination of Amarissa including assessment of mental status (including signs of lethargy or anxiety), complete vital signs (including respiratory rate and

19

blood pressure), assessment of skin turgor (including whether mucous membranes are moist or dry and whether the eyes are sunken) and assessment of weight with a comparison of Amarissa's usual weight.

Dr. Dingler was below the standard of care and [was] negligent because he allowed Amarissa to be discharged from the ER without a urine specific gravity being ordered even though she had a history consistent with dehydration (10 episodes of vomiting and diarrhea), symptoms of moderate dehydration (anxiety and ill appearing) and a significant decrease in Amarissa's weight (i.e. nearly 11%). Dr. Dingler was below the standard of care and negligent because he allowed Amarissa to be discharged from the ER without administration of oral replacement therapy (ORT). Dr. Dingler was below the standard of care and negligent because he allowed Amarissa to be discharged from the ER without adequate discharge instructions regarding the signs and symptoms of dehydration, without adequate instructions for home oral replacement therapy and with specific instructions for Amarissa to be given Benadryl every 6-8 hours.

On appeal, Dr. Dingler asserts that Dr. Kennedy did not provide a fair summary of Dr. Dingler's negligence. Dr. Dingler claims that Dr. Kennedy "needed to provide some factual information that Dr. Dingler did not train, supervise, or monitor Nurse Benish, rather than merely express an ipse dixit opinion that because Nurse Benish allegedly breached the standard of care, she must not have been trained or supervised properly." But Dr. Kennedy's report does provide a fair summary of Dr. Dingler's alleged standard of care violations and does provide specific allegations of standard of care violations by Dr. Dingler, not just Nurse Benish.

20

To recap the standard of care portions of Dr. Kennedy's report set forth above concerning Dr. Dingler, Dr. Kennedy set forth at least two specific standard of care violations by Dr. Dingler: (1) he failed to adequately supervise and train Nurse Benish by (a) failing to ensure she knew how to take an adequate medical history, (b) failing to ensure she knew how to perform an adequate physical exam, and (c) failing to adequately train her on recognition and treatment of dehydration;[8] and (2) discharging Amarissa (a) without a urine specific gravity study being ordered, (b) without implementing oral replacement therapy at the hospital or providing instructions for it at home and (c) with instructions for the administration of Benadryl. After setting forth these standard of care violations, Dr. Kennedy's report sets forth the conduct that the standard of care required in the taking of a medical history: taking an adequate history "that included the duration, severity and quantity of the vomiting and diarrhea, the order in which the symptoms developed, the presence or absence

---

[8] In one subpart of one subissue, Dr. Dingler appears to argue that these standard of care violation allegations constitute an allegation of "vicarious" liability against Dr. Dingler. We cannot agree; the portions of Dr. Kennedy's report concerning Dr. Dingler allege specific acts or omissions by Dr. Dingler himself. Moreover, if the Grotties had asserted a theory of vicarious liability against Dr. Dingler for Nurse Benish's negligence, an expert report addressing only Nurse Benish's negligence would have been sufficient. *See, e.g., Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 867–68 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (recognizing proposition and citing other courts of appeals cases so holding).

21

of fever, the consistency and content of stools and Amarissa's recent intake . . . ." Dr. Kennedy's report then sets forth the conduct that is required to meet the standard of care in the taking of a medical exam: "assessment of mental status . . . , complete vital signs (including respiratory rate and blood pressure), assessment of skin turgor (including whether mucous membranes are moist or dry and whether the eyes are sunken) and assessment of weight with a comparison of Amarissa's usual weight." The report then sets forth the treatment that should have been given to meet the standard of care—"administration of a urine specific gravity study and oral replacement therapy" based on ten episodes of vomiting and diarrhea, symptoms of moderate dehydration, and an 11% decrease in weight—and opines that Dr. Dingler's conduct in allowing Amarissa's discharge without a urine specific gravity study and without oral replacement therapy at the hospital or instructions for it at home and with instructions for administration of Benadryl fell below the standard of care.

For the purpose of a statutory expert report, statements concerning the standard of care and breach need only identify what care was expected and was not given with such specificity that inferences need not be indulged to discern them. *See Palacios*, 46 S.W.3d at 880; *Thomas v. Alford*, 230 S.W.3d 853, 858 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Dr. Kennedy's

22

report meets this requirement. We hold that the trial court did not abuse its discretion by determining that Dr. Kennedy's report was adequate in this regard. We overrule the second portion of Dr. Dingler and Nurse Hopson's subissue 1(c) dealing with Dr. Dingler.

**B. Dr. Kennedy's Opinions that the Standard of Care Violations by Dr. Dingler and Nurse Benish Proximately Caused the Death of Amarissa**

Nurse Benish claims in her first issue that Dr. Kennedy's causation opinions are inadequate because they are conclusory. Dr. Dingler and Nurse Hopson claim in one portion of their subissue 1(d) that Dr. Kennedy was "not qualified to opine regarding the cause of death" and that Dr. Kennedy's causation opinions are "conclusory." They claim that "[f]or Dr. Kennedy to opine regarding Amarissa's cause of death, his CV and expert report need to establish he was qualified regarding the specific issue of dehydration as a cause of death . . . . Dr. Kennedy's CV and expert report merely state[] that he was a medical examiner from 1989 to 1996 . . . and fail to explain how he is qualified to opine regarding the specific issue of cause of death."[9]

---

[9] No Appellant challenges Dr. Kennedy's qualifications to opine on the standards of care or on any Appellant's alleged departure from them. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351(r)(5)(B), .402(b), (c) (Vernon 2005) (setting forth qualifications for experts opining on standards of care and whether defendant departed from them).

23

An expert is qualified to give opinion testimony about the causal relationship between the injury claimed and the alleged departure from the applicable standard of care if he is "otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C) (Vernon Supp. 2008), § 74.403(a) (Vernon 2005). The Texas Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702; *see also Roberts v. Williamson*, 111 S.W.3d 113, 121–22 (Tex. 2003) (recognizing that while medical license does not automatically qualify holder to testify as expert on every medical question, test is not whether expert practices in a particular field of medicine, but rather whether offering party has established that expert has knowledge, skill, experience, training, or education regarding specific issue before court that would qualify expert to give opinion on particular subject and holding that based on qualifications and experience, pediatrician was qualified to opine on cause and effect of neurological injuries). We review a trial court's determination that an expert is qualified under an abuse of discretion standard. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex.

24

App.—Houston [14th Dist.] 2007, no pet.) (citing *Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex.1996)).

Concerning his qualifications, Dr. Kennedy's report states, in part:

I obtained my medical education and graduated from Oregon Health Sciences University in 1978. I completed a Family Practice Residency at Oregon Health Sciences University from 1978 to 1981. Throughout my career I have worked as an Emergency Department physician, a Family Practice physician, a County Medical Examiner and an Associate Professor of Medicine. I am board certified in Emergency Medicine, Family Practice, and Forensic Medicine. I am currently licensed to practice medicine in the states of Texas and Oklahoma.

. . . .

I am knowledgeable with respect to the accepted standards of care for the injuries suffered by Amarissa Grottie while under the care of Leonard Dingler, M.D., Nancy Benish, FNP-C, L. Hopson, R.N. and the health care providers at Nocona General Hospital based on my education, training and experience. I have extensive experience treating pediatric patients in the emergency department including children who have gastroenteritis, vomiting, diarrhea, dehydration and electrolyte imbalance. I have also diagnosed and treated patients with fungal infections of the GI (gastrointestinal) tract.

The "Summary" on the first page of Dr. Kennedy's curriculum vitae states, in part:

Board certified in Emergency Medicine, Family Practice and Forensic Medicine. Fellowship status in the two largest Emergency Medicine societies. Broad experience in Emergency Department management, having served as associate director and chairman of high volume Emergency Departments. Four years Family Practice experience and over 20 years Emergency Medicine experience,

25

having seen over 100,000 patients. Chairman of several quality assurance (TQM/QI/PI) committees.

We cannot agree with Dr. Dingler and Nurse Hopson's argument that the trial court abused its discretion by determining that Dr. Kennedy—who is a physician licensed in Texas, who is board certified in emergency medicine and in forensic medicine, who had practiced emergency medicine for over twenty years, who had experience working as a county medical examiner, and who explained that he had "extensive experience treating pediatric patients in the emergency department including children who have gastroenteritis, vomiting, diarrhea, dehydration and electrolyte imbalance," like Amarissa—was qualified to render an opinion, after reviewing Amarissa's medical records and autopsy results, that her death was caused by dehydration that was not properly treated by Appellants. *See, e.g., Gelman v. Cuellar*, 268 S.W.3d 123, 128 (Tex. App.—Corpus Christi 2008, pet. denied) (holding that "[u]nder the Texas Rules of Evidence, the test is whether the offering party has established that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court"); *McKowen v. Ragston*, 263 S.W.3d 157, 164 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that standard of care expert "is qualified to testify in an area, as here, in which [he] has knowledge, skill, training, and experience, and where the subject of the claim (here, an

26

infection from an AV graft) falls squarely within his medical expertise"); *Kelly v. Rendon*, 255 S.W.3d 665, 673 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (deciding that a doctor was qualified to submit an expert report on standard of care in part because the report indicated the doctor had "experience treating patients with the same condition" as the claimant). *Compare In re McAllen Med. Ctr.*, No. 05-0892, 2008 WL 4051053, at *2 (Tex. Aug. 29, 2008) (orig. proceeding) (holding doctor not qualified to give opinions on hospital's alleged negligent credentialing when her report contained "no reference to any of those [negligent credentialing] guidelines, or any indication that she has special knowledge, training, or experience regarding this process"). We overrule this portion of Dr. Dingler and Nurse Hopson's subissue 1(d).

Dr. Dingler (in a portion of his subissue 1(d)) and Nurse Benish (in her first issue) assert that Dr. Kennedy's report is "conclusory" concerning causation. To establish causation, an expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *see also Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 391 n.32 (Tex. 2008) (defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). To constitute a good faith effort to establish the causal relationship element, the expert report need

not marshal all of the plaintiff's proof, or present evidence as if the plaintiff was actually litigating the merits. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52–53 (Tex. 2002); *Palacios*, 46 S.W.3d at 878. No magic words such as "reasonable medical probability" are required for compliance. *Wright*, 79 S.W.3d at 53. The report, however, must provide enough information within the document to both inform the defendant of the specific conduct at issue and to allow the trial court to conclude that the suit has merit. *Id*. at 52.

We have set forth Dr. Kennedy's opinions on Dr. Dingler's standard of care violations. But Nurse Benish has not challenged Dr. Kennedy's opinions concerning her alleged standard of care violations, so we have not set forth those opinions. We do so here for purposes of analyzing whether Dr. Kennedy's causation opinions adequately link Nurse Benish's alleged standard of care violations to Amarissa's death.

Concerning Nurse Benish's standard of care violations, Dr. Kennedy opined:

> The standard of care for a nurse practitioner treating a nearly two year old child in the emergency department with a history of vomiting and diarrhea requires that the Nurse Practitioner understand that children with fluid and electrolyte disorders require "meticulous diagnostic skills because serious illness may be overlooked with cursory examination or treatment." (quote from Rosen's Emergency Medicine: Concepts and Clinical Practice, Editor John A. Marx, M.D., 2002). The standard of care also requires that the Nurse Practitioner obtain specific information from the

28

parent or caregiver regarding the duration, severity and quantity of the vomiting and diarrhea and the order in which the symptoms developed. Information regarding the presence or absence of fever and the consistency and content of stools should be obtained as well as the child's recent intake, appetite and ability to keep food and fluids down. The Nurse Practitioner should also obtain information about whether other family members are ill, whether the child attends day care and whether the child has recently traveled.

The standard of care requires that the Nurse Practitioner conduct a physical examination of the child that includes assessment of mental status (including signs of lethargy or anxiety), vital signs on admission and discharge (including temperature, heart rate, respiratory rate and blood pressure), assessment of skin turgor (including whether mucous membranes are moist or dry and whether the eyes are sunken) and a general assessment of the ears, throat, heart, lungs, abdomen and extremities. The standard of care requires that a weight be obtained with a comparison of the child's usual weight (according to prior records or information from the parents). When there is a significant decrease in the child's weight (i.e. over 6%) and the child appears ill, the standard of care requires that a urine specific gravity and other serum studies (electrolytes, blood urea nitrogen and creatinine) be obtained to clarify the child's actual fluid and electrolyte status.

The standard of care requires that children with moderate dehydration (6% to 9%) be kept in the ER (or another supervised setting such as a physician's office or urgent care center) to be given a trial of oral replacement therapy (ORT). The dehydration is corrected by giving at least 60-120 ml/hour over several hours. Following this therapy, the child's hydration should be reassessed. The child should not be discharged from the ER until the oral hydration therapy has been successfully given. If the oral replacement therapy is not successful due to intolerance to oral intake or excessive continued losses, the child should be given IV fluids and evaluated for admission if necessary.

The standard of care requires that Nurse Practitioners be aware that the administration of Benadryl or other medications that cause drowsiness is not indicated for the treatment of vomiting and diarrhea due to acute gastroenteritis. The Nurse Practitioner should be aware that if a child is given Benadryl after discharge, the medication will likely make the child drowsy and the parents will not be able to assess whether the child's mental status and condition is deteriorating due to a fluid and electrolyte imbalance.

The standard of care requires that the Nurse Practitioner provide both written and oral discharge instructions to the parent or caregiver. For a child that has been evaluated for multiple episodes of vomiting and diarrhea that is being sent home, the discharge instructions must include specific information regarding the signs and symptoms of dehydration and the amount and types of fluid the child should be given at home. The discharge instructions should indicate potential signs of worsening dehydration such as: dry lips and mouth, a dark color or a strong smell to the urine, not urinating very often or very much, little or no tears when crying, sunken eyes, not paying attention to toys or television, being difficult to wake up, vomiting up nearly everything he/she drinks or eats or feeling thirsty but drinking liquids makes the child vomit. For a child with mild dehydration, the discharge instructions should include information to give the child one or two teaspoons every 5 minutes (approximately 1-2 ounces per hour) of an oral rehydration solution, if the child does well, give bigger sips a little less often (every 5-10 minutes). Continue this process until the child is no longer thirsty, has adequate urinary output and is not showing any signs of dehydration.

DEVIATIONS BY NURSE PRACTITIONER BENISH:

It is my opinion that Nurse Practitioner Benish fell below the standard of care and was negligent by failing to recognize that Amarissa was at least moderately dehydrated and required, at a minimum, oral replacement therapy to be given in the ER. Nurse Practitioner Benish failed to obtain vital information from Ms. Grottie including the duration, quantity and contents of Amarissa's vomiting and the quantity, frequency and consistency of her stools

over the past few days. She also fell below the standard of care by failing to obtain and document information regarding the amount of Amarissa's oral intake, appetite and urinary output over the past few days. Nurse Practitioner Benish fell below the standard of care by failing to obtain and document information regarding whether other family members were ill, whether Amarissa attended day care and whether she had traveled recently.

Nurse Practitioner Benish fell below the standard of care and was negligent by failing to obtain an adequate physical assessment of Amarissa. Nurse Practitioner Benish did not adequately assess Amarissa's mental status. She did not document the presence or absence of lethargy or anxiety. Documentation that a 21-month old child is "alert and oriented" is not adequate. Nurse Practitioner Benish fell below the standard of care by failing to obtain Amarissa's respiratory rate, blood pressure and oxygen saturation upon admission to the ER. She also failed to meet the standard of care by allowing Amarissa to be discharged without a second set of vital signs including temperature, heart rate, respiratory rate and blood pressure. Nurse Practitioner Benish was negligent by failing to assess and document Amarissa's skin turgor including whether her eyes were sunken.

Nurse Practitioner Benish deviated from the standard of care and was negligent when she failed to compare Amarissa's usual weight with the weight obtained in the ER. Ms. Grottie informed the staff that Amarissa's weight was down three pounds compared to the last weight done in her pediatrician's office. This weight reduction is consistent with severe dehydration because it indicates that Amarissa had a nearly 11% weight reduction. Since Amarissa "appeared ill" and "anxious" [and] had a weight reduction consistent with severe dehydration, Nurse Practitioner Benish was negligent when she failed to obtain lab studies (including urine specific gravity and if abnormal serum electrolytes, serum creatinine and serum BUN). Based on reasonable medical probability, I believe that Amarissa's urine specific gravity and blood urea nitrogen more than likely would have been consistent with moderate to severe dehydration. Nurse Benish was negligent when she discharged Amarissa from the ER rather than initiating

31

oral replacement therapy with oral rehydration solution (such as Pedialyte) over several hours.

Nurse Practitioner Benish fell below the standard of care and was negligent when she instructed Ms. Grottie to give Amarissa Benadryl 6.25 mg every six to eight hours and when she failed to give specific written instructions about the signs and symptoms of worsening dehydration (as listed above) and to return to the ER if Amarissa did not tolerate the oral replacement therapy at home (approximately one cup or more per hour until bedtime) or if she did not have an adequate urinary output (i.e. wet diapers).

Dr. Kennedy's report contains the following opinions that the standard of care violations by Dr. Dingler and Nurse Benish caused Amarissa's death:

CAUSATION & INJURIES:

It is my opinion based on reasonable medical probability that the negligence of Nurse Practitioner Benish, Leonard Dingler, M.D. and the ER nurse (L. Hopson, R.N.) at Nocona General Hospital proximately caused Amarissa Grottie's death. Based on reasonable medical probability, I believe that Amarissa had vomiting and diarrhea secondary to acute gastroenteritis. By Sunday, March 13, 2005 she was moderately to severely dehydrated and needed treatment to replace her fluid deficit.

The autopsy findings constitute overwhelming evidence that Amarissa's death was more than likely proximately caused by inadequately treated dehydration. Dr. Gofton [the Medical Examiner] found that Amarissa appeared dehydrated with "markedly" sunken eyes, had dry appearing conjunctive, had no urine in her bladder and she had a postmortem BUN consistent with severe dehydration (57 mg/dL). The comparison of Amarissa's weight just prior to her death to her usual weight indicates that she was more than likely moderately to severely dehydrated while she was in the ER on March 13, 2005.

Amarissa also had fungal esophagitis, but this infection does not usually cause any significant problems and can easily be treated with an oral antifungal medication. I do not believe that fungal esophagitis caused Amarissa's death although it may have caused Amarissa to experience pain upon swallowing.

I believe that the inadequate history and physical examination that was taken by the Nurse Practitioner Benish and Nurse Hopson proximately caused Amarissa's death. If Nurse Practitioner Benish, Dr. Dingler or Nurse Hopson would have obtained an adequate history from Ms. Grottie about the quantity and frequency of her vomiting and diarrhea, they more than likely would have realized that Amarissa was moderately to severely dehydrated and needed a trial of oral replacement therapy in the ER. I believe based on reasonable medical probability that if Nurse Practitioner Benish, Dr. Dingler or Nurse Hopson would have taken Amarissa's respiratory rate and blood pressure and conducted an adequate physical examination (including assessment of skin turgor) they more than likely would have realized that Amarissa was moderately to severely dehydrated and needed the trial of oral replacement therapy in the ER, and if unsuccessful, intravenous fluids with possible admission to the hospital.

I believe that the inadequate and improper discharge instructions that were provided to Ms. Grottie by Nurse Practitioner Benish, Dr. Dingler and Nurse L. Hopson proximately caused Amarissa's death. I believe that the two doses of Benadryl that were given to Amarissa upon the advice of her health care providers more than likely made Amarissa appear drowsy during the late afternoon and evening of March 13, 2005 so that her mother did not attribute her lethargy to the dehydration.

Based on reasonable medical probability, I believe that Amarissa's death at 22 months of age was proximately caused by the failure of her health care providers to provide appropriate treatment of her dehydration. Children are frequently evaluated in the ER when they develop dehydration secondary to vomiting and diarrhea caused by acute gastroenteritis. Dehydration is easily treated with oral replacement therapy or IV fluids. Amarissa Grottie's death is

unfortunate because it could have been easily prevented with appropriate health care as discussed above.

The opinions stated in this report are based upon the information that was available to me when the report was written, and upon my experience, training, background, as well as the medical literature. If additional information is provided, I may change my opinions or may have additional opinions.

These opinions by Dr. Kennedy satisfactorily link Dr. Dingler's and Nurse Benish's purported breaches of the standards of care to Amarissa's death.[10] Dr. Kennedy specifically opined that the negligence of both Dr. Dingler and Nurse Benish caused Amarissa's death. He opined that Amarissa died due to dehydration. Dr. Kennedy opined that the appropriate medical treatment for Amarissa, which no Appellant provided, was "treatment for fluid deficit," first "oral replacement therapy in the ER, and if unsuccessful, intravenous fluids with possible admission to the hospital." He then described in detail how Dr. Dingler's and Nurse Benish's deviations from the applicable medical standards of care[11] proximately caused Amarissa's death. Dr. Kennedy explained that if Dr. Dingler or Nurse Benish had taken a proper medical history or had performed

---

[10] Nurse Hopson has not challenged in any argument on appeal Dr. Kennedy's causation opinions linking her alleged negligence to Amarissa's death.

[11] As we previously mentioned, Dr. Kennedy's opinions concerning Nurse Benish's and Nurse Hopson's standard of care violations are not challenged on appeal; we have overruled Dr. Dingler's challenges to Dr. Kennedy's opinions concerning Dr. Dingler's standard of care violations.

34

an adequate physical examination, they "more than likely would have realized Amarissa was moderately to severely dehydrated." Dr. Kennedy then opined that based on reasonable medical probability, Amarissa's death was proximately caused by the failure of her health care providers to provide appropriate treatment of her dehydration and that dehydration is easily treated with oral replacement therapy or IV fluids. Finally, Dr. Kennedy concluded, "Amarissa Grottie's death is unfortunate because it could have been easily prevented with appropriate health care as discussed above."

Without restating every sentence in the causation portion of Dr. Kennedy's report set forth above, a review of the above paragraphs demonstrates information sufficient enough to inform Dr. Dingler and Nurse Benish of the specific conduct that the Grotties have called into question and how that conduct purportedly caused Amarissa's death. *See, e.g., Wright*, 79 S.W.3d at 52 (explaining that a report is sufficient on causation if it (1) informs the defendant of the specific conduct the plaintiff has called into question and (2) provides a basis for the trial court to conclude the claims are meritorious). Moreover, Dr. Kennedy's causation opinions are not conclusory because they specifically and extensively set forth all of the facts on which they are based. *See, e.g., Arkoma Basin Exploration Co.*, 249 S.W.3d at 392 n.32. The trial court did not abuse its discretion by refusing to find Dr. Kennedy's causation

35

opinions as to Dr. Dingler and Nurse Benish inadequate; we overrule this portion

of Dr. Dingler's fourth issue[12] and Nurse Benish's first issue. *See Mosely v.*

*Mundine*, 249 S.W.3d 775, 781 (Tex. App.—Dallas 2008, no pet.) (holding

expert report sufficient on causation element); *Grindstaff v. Michie*, 242

S.W.3d 536, 544 (Tex. App.—El Paso 2007, no pet.) (same); *Patel v. Williams*,

237 S.W.3d 901, 906 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (same);

---

[12] In one subpart of their fourth subissue 1(d), Dr. Dingler and Nurse Hopson contend that Dr. Kennedy's causation opinions are inadequate because Dr. Kennedy failed to adequately summarize how Appellants' acts, rather than an intervening act after discharge, caused Amarissa's death. Whether Appellants are entitled to a new and independent cause inferential rebuttal instruction will be determined by evidence introduced at trial; an opinion defeating their entitlement to such an instruction need not be included in a statutory expert report. *See, e.g., James v. Kloos*, 75 S.W.3d 153, 161 (Tex. App.–Fort Worth 2002, no pet.); *Hall v. Huff*, 957 S.W.2d 90, 95 (Tex. App.–Texarkana 1997, pet. denied); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises, Products* PJC 50.4 (2006); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(j) (expressly limiting opinions to be included in expert report).

In yet another argument in another subpart of subissue 1(d), Dr. Dingler and Nurse Hopson claim that Dr. Kennedy's report is inadequate because it "fails to explain how he reached a different conclusion on the cause of death than the medical examiner." The autopsy results in the record indicate that the medical examiner concluded that Amarissa's cause of death was "undetermined OSC [Other Significant Causes]: fungal esophagitis; dehydration." Thus, the medical examiner did conclude that dehydration was a significant cause of Amarissa's death. The trial court did not abuse its discretion by refusing to find Dr. Kennedy's report inadequate on this basis.

36

*Bidner v. Hill*, 231 S.W.3d 471, 474 (Tex. App.—Dallas 2007, pet. denied) (same).

### C. Challenges to Nurse Cleveland's Report

In her third issue, Nurse Benish claims that Nurse Cleveland was not qualified to offer an opinion on causation or on "the emergency room standard of care applicable to Nurse Benish." In a portion of their subissue 1(d), Dr. Dingler and Nurse Hopson likewise contend that Nurse Cleveland is not qualified to offer an opinion on causation.

Section 74.351(r)(5)(C) expressly provides that an expert filing a statutory expert report must be "a *physician* who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C) (emphasis added). Consequently, a nurse cannot offer an opinion in a statutory expert report on causation. *See Kelly*, 255 S.W.3d at 675–76. Thus, we sustain the first portion of Nurse Benish's third issue and this portion of Dr. Dingler and Nurse Hopson's subissue 1(d).

We next address Nurse Benish's argument in her third issue that Nurse Cleveland was not qualified to offer an opinion on "the emergency room standard of care applicable to Nurse Benish." Nurse Cleveland's report states the following:

37

I attended Tarrant County College Fort Worth, Texas and obtained an Associate's Degree for Nursing in 1994. I have been a Registered Nurse in the State of Texas from 1994 through the present. I attended the University of Texas in Arlington, Texas and obtained a Bachelor's of Science in Nursing in 1996. I was a staff Nurse at Dallas-Ft. Worth Medical Center from 1994 to 2000. I was also the Director of the Medical Surgical and Pediatric Units in 1995 and 1996. I returned to school at the University of Texas in Arlington, Texas and obtained a Master of Science in Nursing degree specializing as a Family Nurse Practitioner in 2001. I became licensed in the State of Texas as an Advanced Practice Nurse and board certified by the American Nurses Credentialing Center in the area of family practice in 2002. I have been a Family Nurse Practitioner at Lake Arlington Family Medicine with Dr. Dennis Poquiz from January of 2002 through September of 2006 when I began my current employment with Medical-Edge at the Mansfield Family Clinic. I have also worked from 2003 through 2007 as an Assistant Clinical Professor for the University of Texas in Arlington, Texas and Texas Women's University in Dallas, Texas precepting Nurse Practitioner students at the place of my employment.

. . . .

In my education, training and work experience as a Family Nurse Practitioner and Registered Nurse, I have had extensive experience managing the care of children with vomiting and diarrhea due to acute gastroenteritis. I have diagnosed and treated numerous patients (including children) with vomiting, diarrhea and dehydration from acute gastroenteritis. In my role as an Assistant Clinical Professor for the University of Texas in Arlington, I have provided teaching to Family Nurse Practitioner students that have cared for children with vomiting, diarrhea and dehydration. The standard of care for the evaluation and treatment of a child with mild to moderate dehydration that does not require IV therapy is the same regardless if the care is provided in an office setting or in an emergency department. If a patient with severe dehydration is seen in an office setting, the patient will usually be referred to the emergency department for IV therapy and in-patient care.

38

Nurse Benish basically argues that because Nurse Cleveland has not practiced in an emergency room setting, she is not qualified.

Section 74.351(r)(5)(B) sets forth the qualifications of persons giving an opinion in a statutory expert report concerning whether a nonphysician health care provider such as Nurse Benish departed from accepted standards of health care.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B).  That section authorizes a person to give such an opinion if they are an "expert qualified to testify under the requirements of Section 74.402."  *Id*.  Section 74.402(b) provides,

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or conditions involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

39

*Id*. § 74.402(b). The statute does not require, as Nurse Benish seems to argue, that Nurse Cleveland have practiced in an emergency room setting in order to be qualified to render standard of care opinions for the proper treatment of a child with vomiting and diarrhea. Rather, the statute specifically provides that a person is qualified if they are "practicing health care *in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider.*" *Id.* (emphasis added). Nurse Cleveland's report and curriculum vitae establish that she practices health care in a field of practice that involves the same type of care or treatment as that delivered by Nurse Benish. Nurse Cleveland's report and curriculum vitae establish that she has thirteen years' experience as a registered nurse, seven years' total experience as a nurse practitioner, five years' experience as a nurse practitioner in a family practice office setting, and that she possesses "extensive experience managing the care of children with vomiting and diarrhea due to acute gastroenteritis." In light of the controlling statutory language and Nurse Cleveland's education, training, and experience, we cannot conclude that the trial court abused its discretion by determining that Nurse Cleveland was qualified to offer opinions on the standard of care applicable to Nurse Benish. We overrule the second portion of Nurse Benish's third issue.

## VI. Conclusion

Viewing the information set forth within the four corners of Dr. Kennedy's and Nurse Cleveland's reports (and disregarding Nurse Cleveland's causation opinions), we hold that the trial court did not abuse its discretion by determining that Dr. Kennedy was qualified to offer causation opinions, that both reports provide a fair summary of Dr. Kennedy's and Nurse Cleveland's opinions as to the "applicable standards of care, [and] the manner in which the care rendered by the physician or health care provider failed to meet the standards," and that Dr. Kennedy's report provides a fair summary of the causal relationship between the health care providers' failure to meet the standards of care and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 878. Having addressed all of Appellants' issues, subissues, and arguments within the subissues and having either determined that we need not reach Appellants' arguments or overruled Appellants' issues, subissues, or arguments within subissues (with the exception of Appellants' assertion that Nurse Cleveland was statutorily disqualified from offering a causation opinion), we affirm the trial court's March

8, 2007 order overruling Appellants' objections to Dr. Kennedy's and Nurse

Cleveland's reports and denying Appellants' motions to dismiss.


                                        SUE WALKER
                                        JUSTICE


PANEL: GARDNER and WALKER, JJ.; and DIXON W. HOLMAN, J. (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: February 19, 2009