

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00122-CV

HERIBERTO MARTINEZ-
GONZALEZ

APPELLANT

V.

EC LEWISVILLE, LLC, D/B/A ELITE
CARE EMERGENCY CENTER;
GREATER HOUSTON
EMERGENCY PHYSICIANS, PLLC,
D/B/A ELITE CARE EMERGENCY
CENTER; AND DR. HARVEY
CASTRO

APPELLEES

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 15-04212-158

----------

## MEMORANDUM OPINION[1]

----------

---

[1]*See* Tex. R. App. P. 47.4.

# I. INTRODUCTION

Appellant Heriberto Martinez-Gonzalez sought emergency medical care from Appellees EC Lewisville, LLC, d/b/a Elite Care Emergency Center; Greater Houston Emergency Physicians, PLLC, d/b/a Elite Care Emergency Center; (Elite Care) and Dr. Harvey Castro for right-side abdominal and flank pain, which was later diagnosed by a physician at Parkland Hospital to be a torsed testicle. Martinez-Gonzalez filed a health care-liability claim (HCLC) against Appellees; Appellees filed a no-evidence motion for summary judgment on the willful[2]-and-wanton element of Martinez-Gonzalez's claim for Appellees' actions occurring prior to March 13, 2014, and a traditional motion for partial summary judgment based on Martinez-Gonzalez's alleged no-causation judicial admission in his second amended original petition concerning Appellees' actions on March 13, 2014, or later. The trial court granted both motions and signed a final judgment for Appellees.

Martinez-Gonzalez perfected this appeal and raises six issues. Because Martinez-Gonzalez brought forward more than a scintilla of summary-judgment evidence showing that Dr. Castro deviated from the applicable standard of care in a willful and wantonly negligent manner and because Appellees' traditional motion for partial summary judgment improperly fractures Martinez-Gonzalez's

---

[2]Unless directly quoting from the civil practice and remedies code, which uses the spelling of "wilful" as opposed to the more common spelling "willful," we will use the more common spelling. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.153 (West 2017).

2

HCLC into two distinct parts, and alternatively because the statement in Martinez-Gonzalez's live pleading is not a judicial admission, we will sustain Martinez-Gonzalez's second and fourth issues and reverse and remand this case to the trial court.

## II. PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

### A. Onset of Symptoms and Martinez-Gonzalez's First Visit to Elite Care

On March 12, 2014, Martinez-Gonzalez experienced abdominal pain, causing him to seek emergency medical care. Martinez-Gonzalez was admitted to Elite Care and evaluated by a registered nurse at 11:41 a.m. The nurse's impressions are recorded on Elite Care's form entitled "Emergency Nursing Record" and subtitled "Abdominal Pain / NVD." The nurse wrote that Martinez-Gonzalez complained of waxing and waning flank and gas pain, which had begun about six hours prior and involved nausea and vomiting. Martinez-Gonzalez claims that he also told the nurse that he was having inner thigh and groin pain, but this complaint was not recorded by the nurse.

Dr. Castro's subsequent evaluation is recorded on Elite Care's form entitled "Emergency Physician Record" and subtitled "Abdominal Pain / Flank Pain." The form contains numerous boxes to check, apparently to record various impressions and the patient's complaints and to guide the physician to other related examinations and tests. Many of the boxes were checked, but Dr. Castro did not check the box labeled "Male Genital Exam." Although Dr. Castro averred in his summary-judgment affidavit that during the evaluation Martinez-Gonzalez

3

described his pain as an eight out of ten, Dr. Castro also claimed that "Mr. [Martinez-]Gonzalez denied any testicular pain."

Martinez-Gonzalez was provided with intravenous fluids and Zofran for his nausea and vomiting. Dr. Castro ordered a CT scan of Martinez-Gonzalez's abdomen, a urinalysis, and blood work, but Dr. Castro did not order an ultrasound. It is undisputed that Dr. Castro did not perform a genital exam or any other exam related to testicular torsion.

After analyzing the CT scan and test results, Dr. Castro diagnosed Martinez-Gonzalez with an umbilical hernia. Dr. Castro instructed Martinez-Gonzalez to follow up with a gastroenterologist in two days and to return to Elite Care if his conditions did not improve.

### B. Martinez-Gonzalez's Symptoms Persist

### 1. Martinez-Gonzalez returns to Elite Care the next day

Martinez-Gonzalez's symptoms did not improve, so he returned to Elite Care the next day—March 13, 2014.[3] Elite Care did not admit or check in Martinez-Gonzalez for another examination; instead, Dr. Castro met with him in the waiting area. Martinez-Gonzalez informed Dr. Castro of his severe groin and testicular pain, as well as abdominal and right flank pain. In his summary-judgment affidavit, Dr. Castro states that Martinez-Gonzalez's complaints

---

[3]Dr. Castro contends that Martinez-Gonzalez arrived at Elite Care at approximately 4:00 p.m. on March 13, 2014. Martinez-Gonzalez disputes that he arrived at 4:00 p.m., but he does not provide a time of arrival.

4

regarding abdominal pain were the same but that Martinez-Gonzalez's complaints of groin pain were "new." The parties dispute what happened next.

Dr. Castro states in his summary-judgment affidavit that he advised Martinez-Gonzalez to check in to Elite Care for further evaluation and possible transport to another facility but that Martinez-Gonzalez refused because he only wanted pain medication. Martinez-Gonzalez denies this account and in his summary-judgment affidavit, he contends that Dr. Castro suggested that he should go to Parkland Memorial Hospital in Dallas because there was nothing else that Dr. Castro could do for him. Martinez-Gonzalez's affidavit states that he did not go to Elite Care simply to ask for pain medicine without treatment and that he did not refuse care or transfer. Martinez-Gonzalez claims that Dr. Castro did not attempt to check him in or examine him but was trying to "rush me out."

## 2. Martinez-Gonzalez leaves Elite Care and is admitted at Parkland

Martinez-Gonzalez left Elite Care and sought treatment at Parkland. Parkland's records indicate that Martinez-Gonzalez complained of groin pain lasting for one and one-half days. Parkland's medical personnel performed a genital examination and an ultrasound and diagnosed Martinez-Gonzalez with testicular torsion.[4] Martinez-Gonzalez underwent exploratory surgery during which his right testicle was found to be nonviable and was removed.

---

[4]"Testicular torsion occurs when a testicle rotates, twisting the spermatic cord that brings blood to the scrotum." *Sison v. Andrew M.*, No. 02-16-00129-CV, 2017 WL 3974356, at *2 (Tex. App.—Fort Worth Sept. 7, 2017, pet. filed) (mem. op.).

5

## C. Martinez-Gonzalez Contacts Dr. Castro After Surgery

While he was recovering on March 14, 2014, Martinez-Gonzalez called Elite Care and asked why he had not been diagnosed with testicular torsion in either of his two prior visits. Martinez-Gonzalez spoke to a nurse who recorded Martinez-Gonzalez's complaint and notified Dr. Castro. The following day, Martinez-Gonzalez received a telephone call from Dr. Castro. Martinez-Gonzalez's summary-judgment affidavit states that he informed Dr. Castro of his extreme disappointment about Dr. Castro's medical care and failure to examine him or to call an ambulance to transfer Martinez-Gonzalez to Parkland. Dr. Castro apologized and said that he was trying to save Martinez-Gonzalez money on ambulance fees and that the removal of Martinez-Gonzalez's testicle should not be a "big deal" because Martinez-Gonzalez was thirty-nine and would not be having any more children at his age. Appellees point to nothing in the record to show that Dr. Castro disputes or denies the telephone call or Martinez-Gonzalez's recollection of the conversation.

## D. Martinez-Gonzalez Files Suit

In May of 2015, Martinez-Gonzalez filed the instant HCLC against Appellees. Thereafter, Martinez-Gonzalez timely filed a notice and certificate of service of the report and CV of his expert, Dr. William Gibson. Appellees did not file an objection to Dr. Gibson's report or a motion to dismiss. Martinez-Gonzalez eventually filed a second amended petition.

6

### E. Appellees' Summary-Judgment Motions

Appellees filed a no-evidence motion for summary judgment, asserting that no evidence existed to support the willful-and-wanton-deviation-from-the-standard-of-care element of Martinez-Gonzalez's HCLC against an emergency room physician—Dr. Castro.

Appellees also filed a traditional motion for partial summary judgment "based on insufficient causation evidence."  In this motion, Appellees asserted that multiple statements in Martinez-Gonzalez's second amended petition when taken together, constituted a judicial admission conclusively establishing lack of causation for Appellees' alleged negligence on or after March 13, 2014.  Based on this alleged judicial admission, Appellees asserted that they were entitled to summary judgment as to any acts or omissions occurring on or after March 13, 2014.

### F. Martinez-Gonzalez's Responses to Appellees' Summary-Judgment Motions

Martinez-Gonzalez filed responses to Appellees' summary judgment motions.[5]  Martinez-Gonzalez's response to Appellees' no-evidence motion for summary judgment attached the following summary-judgment evidence:  Dr. Gibson's affidavit[6]; Martinez-Gonzalez's medical records from Elite Care;

---

[5]Martinez-Gonzalez also filed a motion to strike Dr. Castro's affidavit, but the trial court denied it.

[6]Appellees filed a motion to strike Dr. Gibson as an expert, but the trial court denied it.

Martinez-Gonzalez's affidavit; Martinez-Gonzalez's medical-records excerpts from Parkland Hospital; e-mail correspondence from Appellees' insurance provider's representative, Amy Evans; a description of Elite Care as a free-standing emergency department; excerpts from the Texas Administrative Code; and Appellees' responses to Martinez-Gonzalez's requests for production.

Noting that Martinez-Gonzalez complained of waxing and waning pain on March 12, 2014, Dr. Gibson's summary-judgment affidavit provided, in part, as follows:

> The standard of medical care indicates that **any male** of Mr. Martinez-Gonzalez's age presenting with unexplained abdominal pain should have a complete abdominal and testicular examination. Without prompt medical treatment, the testicle can die within hours to days. However, waxing and waning is correlated with a condition called intermittent torsion. The literature indicates that there is a condition known as intermittent torsion, whereby the torsion is only partial, and can spontaneously detorse, or retorse, causing intermittent pain. With waxing and waning, or intermittent torsion with blood flow running through [the] testicle, the testicle could last more than 24 hours, or even possibly a few days. As such, it is possible for [the] testicle to be viable for more than 24 hours, or more. There are cases with patients having intermittent torsion for several days and still having viable testes. (emphasis in original)

Dr. Gibson's affidavit further provides the applicable standard of care for Dr. Castro and Elite Care for March 12 and March 13, 2014, and lists several specific actions that constituted Dr. Castro's and Elite Care's breaches of the standard of care: (1) failure of the nursing staff to denote groin pain on the Emergency Nurse Record, (2) failure to timely diagnose Martinez-Gonzalez, (3) failure to perform a testicular/genital examination, (4) failure to order an

8

ultrasound, (5) failure to re-examine Martinez-Gonzalez after the CT scan, (6) failure to properly document Martinez-Gonzalez's symptoms, and (7) failure to provide Martinez-Gonzalez with appropriate follow-up instructions. Also relevant to the March 12, 2014 visit was Dr. Gibson's opinion that "[a]n ultrasound is the appropriate test to rule out testicular torsion for any male that presents to an emergency room with abdominal pain, flank pain, nausea, and vomiting to rule out testicular torsion."

Dr. Gibson's affidavit states that Dr. Castro also failed to comply with the standard of care, which called for "a complete physical exam of the genitals of a male patient presenting with sudden onset of pain radiating to the groin, right flank pain, vomiting, and nausea." According to Dr. Gibson, "[h]ad this been done, the patient would not have lost his right testicle due to torsion."[7]

### G. The Trial Court's Rulings

After a hearing, the trial court granted both of Appellees' motions for summary judgment and entered a final judgment in their favor. Martinez-Gonzalez raises three issues challenging the no-evidence summary judgment and three issues challenging the traditional, partial summary judgment based on his alleged judicial admission.

---

[7]Dr. Gibson's summary judgment affidavit is attached hereto as Appendix A.

9

### III. SUMMARY JUDGMENT STANDARDS OF REVIEW

When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). If the nonmovant met his burden under rule 166a(i), then we analyze whether the movant satisfied his rule 166a(c) burden. *See id.* at 680–81.

### A. No-evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim. Tex. R. Civ. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if

10

reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## B. Traditional Summary Judgment

Following a traditional summary judgment, the issue on appeal is whether the movant met his summary-judgment burden by establishing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a traditional summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann*

11

*Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller*, 168 S.W.3d at 822–24.

## IV. TRIAL COURT ERRED BY GRANTING NO-EVIDENCE SUMMARY JUDGMENT MOTION

The trial court's order granting Appellees' no-evidence summary judgment states, "The Court is of the opinion Plaintiff failed to put forth more than a scintilla of admissible evidence regarding the subjective element of the willful and wanton standard of proof required under Texas Civil Practice and Remedies Code § [] 74.351." In his second issue, Martinez-Gonzalez contends that the trial court erred by granting Appellees' no-evidence motion for summary judgment because he brought forward more than a scintilla of competent summary-judgment evidence through Dr. Gibson's summary-judgment affidavit showing that Dr. Castro had deviated from the standard of care in a willful and wanton manner.[8]

### A. Deviation from Standard of Care With Willful and Wanton Negligence is Required in Health Care-Liability Claim Arising from Provision of Emergency Medical Care

"Section 74.153 governs health care liability claims for injuries . . . arising from the provision of 'emergency medical care' in a hospital emergency department . . . ." *Turner v. Franklin*, 325 S.W.3d 771, 776 (Tex. App.—Dallas

---

[8]Martinez-Gonzalez and Appellees agree he received "emergency medical care," as that term is defined by section 74.001(7) of the civil practice and remedies code, at Elite Care on March 12 and March 13, 2014. Tex. Civ. Prac. & Rem. Code § 74.001(7) (West 2017).

2010, pet. denied).  Section 74.153 sets forth the following standard of proof in HCLCs involving emergency medical care:

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem. Code Ann. § 74.153.  Thus, in a HCLC arising from the provision of emergency medical care, the claimant must show by a preponderance of the evidence that the health-care provider deviated from the applicable standard of care with willful and wanton negligence.  *Id.*; *Benish v. Grottie*, 281 S.W.3d 184, 192 (Tex. App.—Fort Worth 2009, pet. denied).

"Section 74.153's statutorily[-]created *standard of proof* and the applicable *medical standards of care* are not the same thing."  *Benish*, 281 S.W.3d at 191.  Instead,

> [t]he medical standard of care is an element of a plaintiff's medical negligence cause of action . . . [while] . . . the standard of proof imposed by section 74.153 requires proof—that is, evidence at trial that will more than likely be circumstantial—that the physician or health care provider's mental state or intent at the time of any deviation from the medical standard of care was wilful and wanton.

13

*Id.* Because *Benish* was an expert-report case, we resolved it without construing "willful and wanton negligence"; instead, recognizing that "whatever definition of wilful and wanton is utilized, section 74.153 requires proof at trial of a *mental state* or *state of mind* beyond mere negligence of the physician or health care provider at the time of the physician or health care provider's deviation from the medical standard of care."[9] *Id.* at 192. In accordance with our holding in *Benish*, Martinez-Gonzalez was required to offer summary-judgment evidence that Dr. Castro's mental state at the time of his alleged deviation from the applicable standard of care was willful and wanton. *See id.*

### B. Willful and Wanton Negligence Means Gross Negligence

Although we did not construe section 74.153's phrase willful and wanton in *Benish*, we now construe this standard-of-proof requirement as meaning proof of gross negligence. *See Turner*, 325 S.W.3d at 781–82. After reviewing the legislative history of section 74.153, the Dallas Court of Appeals in *Turner* held that "the legislature intended 'wilful and wanton negligence,' as used in section 74.153 of the civil practice and remedies code, to mean 'gross negligence.'" *Id.* Several courts of appeals have either expressly adopted *Turner*'s holding or used its definition in their analyses. *See, e.g., Miller v. Mullen*, 531 S.W.3d 771, 779 (Tex. App.—Texarkana 2016, no pet.) ("For purposes of analyzing this summary judgment, we assume the *Turner* definition of the willful and wanton standard, as

---

[9]In *Benish*, we noted that "conflicting definitions [of willful and wanton negligence as used in section 74.153] may exist." 281 S.W.3d at 192.

urged by both parties[.]"); *Burleson v. Lawson*, 487 S.W.3d 312, 322 (Tex. App.—Eastland 2016, no pet.) (quoting with approval *Turner*'s conclusion "that 'willful and wanton negligence' is the equivalent of 'gross negligence'"); *Ho v. Johnson*, No. 09-15-00077-CV, 2016 WL 638046, at *11 (Tex. App.—Beaumont Feb. 18, 2016, pet. denied) (mem. op.) (citing *Turner* to support the proposition willful and wanton negligence "has been interpreted by Texas courts as being equated with gross negligence"); *Sage v. Howard*, 465 S.W.3d 398, 407 (Tex. App.—El Paso 2015, no pet.) ("We agree with *Turner*'s analysis and will follow it.").

Gross negligence has both an objective[10] and a subjective component. *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012). In examining proof of the subjective component, courts focus on the defendant's state of mind, examining whether the defendant knew about the peril caused by his conduct and continued to act in a way that demonstrated he did not care about the consequences to others. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) ("[T]he plaintiff must show that the defendant knew

[10]Because the trial court expressly granted Appellees' no-evidence motion for summary judgment based on the "subjective element of willful and wanton negligence," the objective component is not at issue here, so we do not discuss it. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625–26 (Tex. 1996) ("When reviewing a summary judgment granted on specific grounds, the summary judgment can only be affirmed if the ground on which the trial court granted relief is meritorious."); *see also Miller*, 531 S.W.3d at 780 (addressing no-evidence summary judgment motion based solely on the subjective element of willful and wanton negligence under section 74.153).

15

about the peril, but his acts or omissions demonstrate that he did not care."); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004) ("[I]t is the defendant's state of mind[—]whether the defendant knew about a peril but nevertheless acted in a way that demonstrated that he did not care about the consequences[—]that separates ordinary negligence from gross negligence."); *Turner*, 325 S.W.3d at 784.

But "[g]ross negligence does not require proof that the defendant intended or tried to harm the plaintiff[.]" *Turner*, 325 S.W.3d at 784. Moreover, "[e]vidence of 'some care' will not disprove gross negligence as a matter of law." *Id.*; *see also Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (holding "some evidence of care does not defeat gross-negligence finding"). Thus, we look for evidence of the defendant's subjective mental state rather than the defendant's exercise of care. *Turner*, 325 S.W.3d at 784. "A plaintiff may establish the defendant's mental state by circumstantial evidence." *La. Pac. Corp. v. Andrade*, 19 S.W.3d 245, 247 (Tex. 1999); *see also Benish*, 281 S.W.3d at 191 (recognizing that evidence of physician or health care provider's mental state or intent in emergency medical care negligence case will likely be circumstantial).

### C. Analysis

We examine the summary-judgment evidence, including Dr. Gibson's affidavit, to determine whether the trial court's order granting Appellees' no-evidence summary judgment expressly on the "subjective element of the willful

16

and wanton standard of proof required under Texas Civil Practice and Remedies Code §74.351[,]" can be affirmed on that ground. *See Cincinnati Life Ins. Co.*, 927 S.W.2d at 625–26. Dr. Gibson's affidavit explains that when a male patient of Martinez-Gonzalez's age presents in an emergency-room setting with right-side abdominal and flank pain, the applicable standard of care requires a genital exam and an ultrasound in order to rule out testicular torsion. Dr. Gibson's points out that Elite Care's own emergency-physician-evaluation form— to be used specifically in assessing abdominal pain complaints—includes a place to document a male genital exam for testicular swelling or tenderness, a blank to check to order an ultrasound, and lists testicular torsion as one of the diagnoses to be considered by an emergency-care physician when a male presents with abdominal and flank pain.

Viewed in light most favorable to Martinez-Gonzalez, the summary judgment evidence establishes that: on March 12, 2014, Martinez-Gonzalez went to Elite Care for emergency medical care because he was experiencing symptoms of right-side abdominal and flank pain; Dr. Castro used the emergency-physician-evaluation form for assessing abdominal-pain complaints in his evaluation of Martinez-Gonzalez; Dr. Castro failed to perform a genital exam on Martinez-Gonzalez, failed to note or rule out any testicular swelling or tenderness of Martinez-Gonzalez, and failed to order an ultrasound; the emergency-physician-evaluation form listed "testicular torsion" as one of the possible diagnoses for causing abdominal pain.

17

Dr. Castro's conduct on March 12, 2014 constituted not only a breach of the standard of care, but willful and wanton negligence in deviating from that standard, as opined by Dr. Gibson in paragraphs 19, 20, 21, 22, and 26 of his summary-judgment affidavit.

Examining the entire record, crediting evidence favorable to Martinez-Gonzalez if a reasonable juror could, drawing every inference in his favor from that evidence that a reasonable juror could, and resolving any doubts against Appellees unless reasonable jurors could not, more than a scintilla of summary-judgment evidence exists that would enable reasonable and fair-minded jurors to differ in their conclusions as to whether Dr. Castro subjectively acted with willful and wanton negligence on March 12, 2014, in his decisions to not perform a genital exam or an ultrasound on Martinez-Gonzalez to rule out testicular torsion despite the fact that Martinez-Gonzalez suffered from—according to Dr. Gibson—classic testicular-torsion symptoms and despite the fact that Elite Care's assessment form for use on patients experiencing abdominal pain, which Dr. Castro used, had blanks to note the performance of a genital exam, to note any testicular swelling or tenderness, and to order an ultrasound and listed testicular torsion as a possible diagnosis applicable to a male experiencing abdominal and flank pain severe enough to seek emergency medical care. That is, reasonable jurors could differ in their conclusions as to whether Dr. Castro possessed actual, subjective awareness of the extreme risk that Martinez-Gonzalez suffered from the time-sensitive condition of testicular torsion and yet consciously disregarded

18

that risk and its consequences by not conducting an applicable genital exam or ultrasound. *See Sage*, 465 S.W.3d at 407 (holding more than a scintilla of evidence existed regarding subjective element of willful and wanton negligence under section 74.153); *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks*, 206 S.W.3d at 582); *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822).

Further, the summary-judgment evidence that a reasonable juror could credit favorably to Martinez-Gonzalez establishes that on March 13, 2014, Martinez-Gonzalez returned to Elite Care complaining of excruciating right testicular pain and asked for Dr. Castro. Dr. Castro spoke to Martinez-Gonzalez in the waiting area instead of admitting him for a follow-up examination. Although Dr. Castro claims that Martinez-Gonzalez only wanted pain medication and refused to check into Elite Care, Martinez-Gonzalez claims that he did not ask only for pain medication and did not decline to check in, but instead that Dr. Castro "rushed me out" of Elite Care, said he could do nothing further for Martinez-Gonzalez, and told him to go to Parkland Hospital. Martinez-Gonzalez contends that because he *did* drive himself to Parkland and *did* attain admission there, his actual conduct was inconsistent with Dr. Castro's contention that Martinez-Gonzalez wanted only pain medication and refused to be admitted to Elite Care. Martinez-Gonzalez testified via his summary-judgment affidavit that he spoke with Dr. Castro after his surgery at Parkland to remove his right torsed testicle and that Dr. Castro stated he did not believe that the loss of Martinez-

19

Gonzalez's testicle was a "big deal" because at Martinez-Gonzalez's age, he would not be having any more children.

Concerning Dr. Castro's alleged willful and wanton negligence in deviating from the standard of care applicable on Martinez-Gonzalez's March 13, 2014, visit to Elite Care, Dr. Gibson opines in paragraphs 19, 23, 24, 25, and 26 of his summary-judgment affidavit that Dr. Castro's conduct and actions on March 13, 2014, constituted not only a breach of the standard of care and a violation of various provisions of the Texas Administrative Code, but also constituted willful and wanton negligence in deviating from the standard care.

Again, examining the entire record, crediting evidence favorable to Martinez-Gonzalez if a reasonable juror could, drawing every inference in his favor from that evidence that a reasonable juror could, and resolving any doubts against Appellees unless reasonable jurors could not, more than a scintilla of summary-judgment evidence exists that would enable reasonable and fair-minded jurors to differ in their conclusions as to whether Dr. Castro acted with willful and wanton negligence on March 13, 2014—in his decisions to not admit Martinez-Gonzalez for screening, examination, treatment, and transfer, despite Martinez-Gonzalez's time-sensitive emergency medical condition of a torsed right testicle. Thus, more than a scintilla of evidence exists that that would enable reasonable and fair-minded jurors to differ in their conclusions as to whether Dr. Castro's deviations from the standard of care on March 13, 2014, were done with willful and wanton negligence. *See Turner*, 325 S.W.3d at 784–85 (holding

20

defendant's expert testimony of no willful and wanton negligence in deviation from standard of care applicable to testicular torsion did not conclusively negate willful and wanton element); *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks*, 206 S.W.3d at 582; *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822).

We hold that the trial court erred by granting summary judgment on Appellees' no-evidence motion for summary judgment. We sustain Martinez-Gonzalez's second issue.[11]

## V. TRIAL COURT ERRED BY GRANTING APPELLEES' TRADITIONAL MOTION FOR PARTIAL SUMMARY JUDGMENT

In his fourth issue, Martinez-Gonzalez contends that the trial court erred by granting Appellees' traditional motion for partial summary judgment because statements in his live pleading did not constitute a judicial admission regarding causation and because he set forth competent summary-judgment evidence to create a genuine issue of material fact on causation.

### A. Impermissible Fracturing of Martinez-Gonzalez's HCLC

Appellees' traditional motion for a partial summary judgment is improper. It impermissibly fractures Martinez-Gonzalez's single HCLC into two distinct parts

---

[11]Martinez-Gonzalez's first and third issues also challenge the propriety of the no-evidence summary judgment granted by the trial court, but because we reverse the no-evidence summary judgment *in toto* based on Martinez-Gonzalez's second issue and because Appellees' no-evidence motion for summary judgment was granted solely on the subjective element of the willful and wanton standard of proof, we need not address his other issues challenging the no-evidence summary judgment. *See* Tex. R. App. P. 47.1.

21

for purposes of attaining a judgment: a HCLC for Appellees' conduct on or before March 12, 2014, and a HCLC for Appellees' conduct on or after March 13, 2014. Appellees' traditional motion for partial summary judgment asserted that no causation exists for Appellees' acts on or after March 13, 2014, and sought a "partial" summary judgment on the portion of Martinez-Gonzalez's HCLC that encompassed Appellees' alleged negligent acts on or after March 13, 2014.[12] A trial court is not authorized to adjudicate fragmentary issues of fact or law which are not dispositive of any claim or contention or to render summary judgments splitting a cause of action. *See* Timothy Patton, *Summary Judgments in Texas: Practice, Procedure and Review* § 3.03[1] (3d ed. 2017) (citing *Pecorino v. Raymark Indus., Inc.*, 763 S.W.2d 561, 570, 576 (Tex. App.—Beaumont 1988, no writ)). Thus, because Appellees' traditional motion for partial summary judgment attempts to negate causation in Martinez-Gonzalez's HCLC only from March 13, 2014, forward, it impermissibly fractures Martinez-Gonzalez's HCLC and is improper. *Id.* The trial court erred by granting a traditional, partial summary judgment on causation on the portion of Martinez-Gonzalez's HCLC alleging negligent acts by Appellees on or after March 13, 2014.

---

[12]Appellees argued that on March 13, 2014, based on the alleged judicial admission in Martinez-Gonzalez's live petition, too much time had passed to save Martinez-Gonzalez's testicle, regardless of Dr. Castro's alleged acts and omissions on that date, thereby defeating causation as a matter of law as to Appellees' negligence on March 13, 2014.

The sole basis for Appellees' traditional motion for partial summary judgment is the alleged judicial admission by Martinez-Gonzalez. Because the statement pleaded by Martinez-Gonzalez does not meet the requisites of a judicial admission, as we discuss below, we alternatively hold that the trial court erred by granting Appellee's traditional motion for partial summary judgment for this reason.

## B. No Judicial Admission

A judicial admission must be a clear, deliberate, and unequivocal statement, and occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings or evidence unnecessary. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (quoting *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex. 1996) and *Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 884 (Tex. App.—San Antonio 1996, writ denied)). As long as the statement stands unretracted, it must be taken as true by the court and the jury. *See Lee v. Lee*, 43 S.W.3d 636, 641 (Tex. App.—Fort Worth 2001, no pet.). Assertions of fact, not pleaded in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. *Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 568 (Tex. 2001). A statement of opinion, however, is not susceptible to being characterized as a judicial admission. *See Hedge v. Bryan*, 425 S.W.2d 866, 868 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e.) ("[I]n order for a statement to constitute a judicial admission, it must . . . be

23

a statement of fact, rather than opinion."); *Roberts v. Burkett*, 802 S.W.2d 42, 45 (Tex. App.—Corpus Christi 1990, no writ) ("Statements of opinion are not judicial admissions.").

## C. Analysis

In paragraph 15 of the "Background Facts" section of Martinez-Gonzalez's second amended petition, he pleads that on March 12, 2014, he was evaluated by a registered nurse at Elite Care at 11:41 a.m.; that he reported his pain level to be an eight out of ten; that he complained of pain radiating to his inner thigh/groin but the nurse did not note this; that his abdominal pain and back pain began at about 6:00 a.m. and had increased by 10:00 a.m.; that he took Tums around 10:30 a.m.; and that when his pain did not improve, he went to Elite Care. Paragraph 21 of the "Background Facts" section of Martinez-Gonzalez's second amended petition alleged:

> A testicular examination should be performed on any male presenting with a chief complaint of lower abdominal pain, back/ flank pain, or any pain that radiates to the groin. It is well established that testicular torsion may cause referred pain to the abdomen thereby requiring a genital exam. Early diagnosis and treatment are vital to saving the testicle and preserving future fertility. The testis salvage rate approaches 100% in patients who undergo detorsion within 6 hours of the start of pain. However there is only a 50% viability rate if detorsion occurs >12 hours; and virtually no viability if detorsion is delayed >24 hours.[4] [citing Wampler SM, Llanes M (September 2010). 'Common scrotal and testicular problems'. *Prim. Care* 37 (3): 613–26."] Gonzalez exhibited fairly textbook presentation of acute testicular torsion that mandated prompt diagnosis and treatment. However, the diagnosis apparently was not even entertained, nor was proper treatment initiated. Elite care failed to have in place a procedure or protocol

24

that would implement timely emergency medical care for an individual complaining of testicular pain.

Appellees intertwine paragraph 15's estimation—that Martinez-Gonzalez's "abdominal pain and back pain began at *about 6 a.m.*"—with paragraph 21's statement that: "[t]he testis salvage rate approaches 100% in patients who undergo detorsion within 6 hours of the start of pain. However there is only a 50% viability rate if detorsion occurs >12 hours; and virtually no viability if detorsion is delayed >24 hours[.]" Then Appellees perform the math.[13] Then Appellees argue that putting the statements in paragraphs 15 and 21 together and superimposing the computed math on Martinez-Gonzalez's petition, Martinez-Gonzalez has therefore judicially admitted that no causation exists in his HCLC against them concerning any willful and wanton deviation from the standard of care on March 13, 2014, because Martinez-Gonzalez arrived at Elite Care on March 13, 2014, more than twenty-four hours after the onset of his symptoms.

We cannot agree that this required combination of juxtaposing different pleaded background statements, intertwining them, and computing math based

---

[13]The math is as follows. Computing 12 hours after paragraph 15's "around 6:00 a.m." on March 12, 2014 equals approximately 6 p.m. on March 12, 2014; so, juxtaposing that with paragraph 21's viability rates, a 50% right-testicle viability rate exists for Martinez-Gonzalez only through 6 p.m. on March 12, 2014. Then, adding another 12 hours to 6 p.m. on March 12, 2014 (to reach 24 hours) equals 6:00 a.m. on March 13, 2014. And juxtaposing that with paragraph 21's viability rates, a 0% viability rate for Martinez-Gonzalez's right testicle existed by 6:00 a.m. on March 13, 2014.

solely on a medical article's stated testicle-salvage rates cited in a footnote of a live pleading, is a statement of fact that is clear, deliberate, and unequivocal as required to constitute a judicial admission. *See Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 905 (holding plaintiff's pleadings constituted judicial admission that defendant was a health care entity). It is not clear; multiple statements must be intertwined and math computed to reach the statement purportedly "judicially admitted." It is neither deliberate nor unequivocal for the same reason. Nor is it a statement of fact. At most, it is a statement of medical opinion in a medical article cited in a footnote of Martinez-Gonzalez's second amended original petition. *See, e.g.*, *Hedge*, 425 S.W.2d at 868 (explaining statement of opinion is not judicial admission). Moreover, it was controverted by Dr. Gibson's summary-judgment affidavit.[14] And finally, pleadings are generally not competent evidence in a summary judgment proceeding in any event. *See, e.g.*, *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995) ("Generally, pleadings are not competent evidence, even if sworn or verified."); *see also In re B.I.V.,* 870 S.W.2d 12, 13–14 (Tex. 1994) (holding that summary judgment should not be based on a pleading deficiency that could be cured by

---

[14]Dr. Gibson's affidavit set forth expert testimony explaining that because Martinez-Gonzalez articulated that his abdominal pain symptoms were "waxing and waning," as noted in Appellees' medical records, Martinez-Gonzalez could have been experiencing intermittent testicular torsion, where the testis twists and untwists on the spermatic cord. According to Dr. Gibson, under this diagnosis, "it is possible for [a] testicle to be viable up to 24 hours or more. There are cases of patients that have had intermittent torsion for several days and still have viable testicles."

amendment); *Womack v. Allstate Ins. Co.*, 296 S.W.2d 233, 237 (Tex. 1956) ("[W]hen the affidavits or other summary judgment 'evidence' disclose facts which render the position of the moving party untenable, summary judgment should be denied regardless of defects which may exist in the pleadings of the [nonmovant].").

We therefore hold that the trial court erred by granting Appellees' traditional motion for partial summary judgment. We sustain Martinez-Gonzalez's fourth issue.

## VI. CONCLUSION

Having sustained Martinez-Gonzalez's second issue resulting in reversal of the trial court's no-evidence summary judgment and having sustained Martinez-Gonzalez's fourth issue resulting in the reversal of the trial court's traditional, partial summary judgment, we need not address Martinez-Gonzalez's first, third, fifth, or sixth issues. *See* Tex. R. App. P. 47.1. We reverse the summary judgments granted by the trial court and remand this case for further proceedings. *See* Tex. R. App. P. 43.2(d), 43.3.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ

DELIVERED: March 8, 2018

27

# APPENDIX A

| | | |
|---|---|---|
| HERIBERTO MARTINEZ GONZALEZ | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | |
| | § | |
| | § | DENTON COUNTY, TEXAS |
| EC Lewisville, LLC d/b/a ELITE CARE | § | |
| EMERGENCY CENTER; Greater Houston | § | |
| Emergency Physicians, PLLC, d/b/a Elite | § | |
| Care Emergency Center AND DR. | § | 158th JUDICIAL DISTRICT |
| HARVEY CASTRO. | § | |

## AFFIDAIVIT OF WILLIAM GIBSON, M.D.

1. My name is Dr. William Gibson. I have personal knowledge of the matters set forth herein. If called upon to testify as a witness in this cause of action I could testify competently regarding these matters. I am acquainted with the facts herein stated, they are within my knowledge, just and true, and I make this affidavit and state the following to be true and correct.

2. I have been retained as an expert in this cause of action. I am over twenty-one (21) years of age, of sound mind, and qualified and competent to testify to the following facts which are based on my education, training, knowledge, and direct experience in the diagnosis, care and treatment of emergency patients with conditions similar to those of acute abdominal pain and testicular torsion. I have personal knowledge and familiarity with the facts of this case. My Curriculum Vitae summarizing my medical education, board certification and clinical experience is attached as Exhibit "A." My opinions are based on reasonable medical probability. My opinions concern the care and treatment received by Mr. Heriberto Martinez-Gonzalez, or lack thereof, with regard to the applicable standard of care, and the manner in which the care was rendered to Mr. Martinez-Gonzalez. Based on my history, knowledge, training and direct experience, I am qualified to offer opinions on the care that he received during his emergency department visit on March 12, 2014 based on the medical records from Elite Care Emergency Center for March 12, 2014 and medical records from Parkland Hospital which included the ER visit on March 13, 2014, urology consultation and operative report, and materials reviewed. I also offer an opinion also based on evidence that the patient presented for care on March 13, 2014.

3. I am a practicing physician and have been throughout the relevant time period of this lawsuit. I have knowledge of the accepted standards of medical care for the diagnosis, care, or treatment of testicular torsion, and I am qualified on the basis of my education, training and experience to offer an expert opinion regarding this matter. Specifically, I am a medical doctor currently licensed to practice medicine in the state of Texas. I am currently an independent contractor in emergency medicine. I have practiced medicine continuously for 27 years, including during the time of this incident, and as part of my

1

459

practice, have been, and am currently, involved in the diagnosis, care, and treatment of many patients who presented with abdominal pain, including patients with acute testicular torsion.

4.  At the time of the incident in question involving Mr. Martinez-Gonzalez, and through to the present, I have been treating patients with symptoms and conditions the same as, or similar to, those experienced by Mr. Martinez-Gonzalez. I am familiar with the accepted medical standards of care applicable to the assessment, examination, diagnosis, and treatment of patients with acute abdominal pain and the differential to include acute testicular torsion similar to those experienced by Mr. Martinez-Gonzalez during that time and described in the referenced medical records. I am qualified to comment on the standard of care provided by emergency health care providers in this field.

    I acquired this education, knowledge, training and experience through:

    a.  my attending, and successfully completing, medical school classes, and residency, that teach the evaluation, examination, diagnosis, care and treatment of patients with the same, or similar conditions, as Mr. Martinez-Gonzalez, including, but not limited to, acute abdominal pain, lower urinary tract infections, upper urinary tract infections, kidney stones and acute testicular torsion;

    b.  my practical experience evaluating, examining, diagnosing and treating patients with acute testicular torsion;

    c.  my discussions with colleagues at yearly conferences, seminars and meetings;

    d.  my study of technical works routinely published in textbooks, journals and literature concerning the emergency care and treatment, evaluation and diagnosis of patients with the same or similar conditions as acute testicular torsion, including, but not limited to lower urinary tract infections, upper urinary tract infections and kidney stones.

    e.  my routine discussions and consultations with other physicians and emergency health care professionals who also evaluate, examine, diagnose and treat patients with the same or similar conditions as acute testicular torsion, including, but not limited to lower urinary tract infections, upper urinary tract infections and kidney stones. From the time of the incident in question, and through to the present, I have had an active clinical practice evaluating, examining, diagnosing, caring for and treating patients with the acute abdominal pain such as Mr. Martinez-Gonzalez. I have participated in the development and implementation of hospital protocols, policies and procedures, for the standards of emergency care for emergency medical physicians, emergency medical technicians, paramedics, and other emergency health care providers who evaluate, examine, diagnose, care for and treat patients with abdominal pain. I have worked with, and helped train, physicians in the diagnosis and management of acute abdominal pain including formal lectures and the writing and proctoring of simulator cases of adults with abdominal pain. Based

2

on my education, training, knowledge and direct experience, I am familiar with the accepted, and expected, standards of care as listed below, for hospitals and medical personnel who are called to evaluate, examine, diagnose, care for and treat patients with the same or similar conditions as Mr. Martinez-Gonzalez, to include the diagnosis and management of acute testicular torsion. I am therefore qualified to offer opinions on these standards of care, the breaches of the standards of care, and the causation link between these breaches and violations of the standards of care in the case of Mr. Martinez-Gonzalez.

5. In my medical practice, I routinely rely on medical records, nursing records, laboratory reports, diagnostic tests and images, consulting physician reports, and other patient data. I consider materials of this type to be generally reliable, unless evidenced otherwise, and they are the type of materials routinely relied upon by physicians and other clinical staff in providing care to patients.

6. There is no difference in the applicable standards of care for the city and surrounding areas of The Colony, Texas, as opposed to the same practice in the emergency care setting in other areas of Texas or anywhere else in the United States. Based upon my education, training, and experience, I am very familiar with the standard of medical care in the emergency care setting for physicians, emergency care nurses, personnel and emergency care health care facilities concerning the diagnosis, treatment, and assessment of patients in the emergency care setting, just like Mr. Martinez-Gonzalez, presenting with the signs, symptoms and complaints of acute testicular torsion.

7. The medical records indicate that on March 12, 2014, Mr. Martinez-Gonzalez was evaluated for acute abdominal pain at the Emergency Department at Elite Care Emergency Center, "right side abdominal pain" onset six hours previously. The nurse history section indicated the area of pain on the Emergency Nursing Record as the entire right abdomen and the right flank. The physical exam on this form showed tenderness to the right lower quadrant. His vital signs showed a blood pressure of 130/77, pulse 55, respiratory rate of 16 and a temperature of 98.2 with oxygen saturation of 98%. Mr. Martinez-Gonzalez at that time was a 39-year old man with no significant past medical or surgical history per the nursing note.

8. Mr. Martinez-Gonzalez contends in his affidavit and petition that he complained of pain to the right inner thigh and groin. The physician note from Elite Care's medical records indicates abdominal pain with right flank pain for 6 hours of a waxing and waning nature. These signs and symptoms were highly correlative of testicular torsion. The physician history indicates that the patient had a bowel movement today and "pt thinks gas pain". Pain was rated as 8/10. Associated symptoms were noted to be nausea and vomiting. Pain exacerbated by movements but relieved by nothing. Physical examination noted by the physician showed tenderness on the right flank and entire right anterior abdomen, identical to those indicated by the nurse. No genital examination was recorded. The patient had a normal white blood cell count, normal electrolytes with slightly elevated AST and ALT, as well as a fasting glucose of 120. Urinalysis was normal as was his EKG. CT scan showed evidence of a fatty liver and a small, fat containing umbilical

3

461

hernia. The physician note indicates that a re-examination was done, but does not address whether or not the physician could palpate the umbilical hernia, nor whether pressing on the hernia elicited pain similar to those for which the patient was complaining. No genital exam was documented in the re-examination. The Clinical Impression section was annotated showing "abdominal pain-acute" and "umbilical hernia". Appendicitis, Ureterolithiasis/renal colic and UTI/pyelonephritis were ruled out as indicated by back-slashes. Testicular torsion, which was listed among the possible clinical impression box as a possible cause of abdominal pain, was not annotated. The patient was discharged, but continued to have pain with swelling to his right testicle.

9. Elite Care concedes that the patient returned on March 13, 2014, complaining of groin pain, and requested to see Dr. Castro concerning his testicular pain and symptoms. Despite Mr. Martinez-Gonzalez continued complaints of groin, abdominal and flank pain, Dr. Castro and Elite Care did not admit the patient or attempt to medically screen the patient to determine whether an "emergency condition" existed. Further, Dr. Castro did not attempt to stabilize the patient by attempting to physically detort him. Rather, Dr. Castro and Elite Care contend Martinez-Gonzalez refused care because he did not want to incur cost for screening and transfer to a hospital. Notwithstanding, the patient sought care and was subsequently evaluated appropriately by Parkland Hospital Emergency Room later the same evening. The patient informed Parkland that he had been having groin pain for 1.5 days. He further advised Parkland that he was evaluated by Elite Care, but was sent home. At Parkland, a prompt urological consultation and a testicular ultrasound were obtained based on the patient's symptoms and exam. The patient was taken promptly to the operating room where the right testicle was found to be non-viable and required removal.

10. Testicular torsion is a condition whereby the testicle becomes twisted on its own spermatic cord and if not timely treated the testicle will die. The standard of medical care indicates that *any male* of Mr. Martinez-Gonzalez's age presenting with unexplained abdominal pain should have a complete abdominal and testicular examination. Without prompt medical treatment, the testicle can die within hours to days. However, waxing and waning is correlated with a condition called intermittent torsion. The literature indicates that there is a condition known as intermittent torsion, whereby the torsion is only partial, and can spontaneously detorse, or retorse, causing intermittent pain. With waxing and waning, or intermittent torsion with blood flow running through testicle, the testicle could last more than 24 hours, or even possibly a few days. As such, it is possible for testicle to be viable for more than 24 hours, or more. There are cases with patients having intermittent torsion for several days and still having viable testes.

11. There was a duty owed to Mr. Martinez-Gonzalez by Harvey Castro MD and the Elite Care Emergency Center to do what a reasonable emergency medical provider and reasonable emergency medical system would have done under the same or similar circumstances, or not to do what a reasonable emergency medical provider and emergency medical system would not have done under the same or similar circumstances. The standard of care required that Harvey Castro MD be aware of the proper evaluation of abdominal pain, to include the features of acute testicular torsion and the need for a testicular exam for the

4

complaint of right sided abdominal pain as well as the laboratory and radiological means for evaluating for acute testicular torsion. Mr. Martinez-Gonzalez's presentation of right sided abdominal pain is typical with patients with testicular torsion. The lack of a proper physical examination which included a genital exam clearly violated the established standard of care, and constitutes willful and wanton negligence. The differential diagnosis of abdominal pain clearly includes testicular torsion, and it is listed as such in the major emergency medicine and adult medicine textbooks. This phenomenon is also discussed in current medical review articles on abdominal pain, where testicular torsion is included in the differential diagnosis. The physical examination is the first step towards ruling in or excluding the diagnosis of testicular torsion. References 1-6[1].

12. Dr. Castro and Elite Care breached that standard of care. This is a fairly typical textbook presentation of acute testicular torsion, yet Harvey Castro MD failed to recognize it as such and to properly evaluate and treat the patient accordingly (References 1-6 including emergency medicine textbook, internal medicine textbook and recent review articles). Testicular torsion is a common enough cause of abdominal pain that it is listed in the most common diagnosis of the assessment box of the Elite Care Emergency Physician Record. The failure to perform a genital examination is a clear breach of the acceptable standards of care for evaluating abdominal pain in a male patient. The specific actions that the providers at Elite Care failed to perform on 03/12/14, and therefore breached the standard of care are:

   a. Failure of the nursing staff to denote groin pain on the patient's record. Patient states he presented to the clinic informing the nurse that he had groin pain but nurse failed to document that information.

   b. Failure to timely diagnose Mr. Martinez-Gonzalez. The patient presented into an emergency clinic with symptoms of abdominal pain with right flank pain of a duration of 6 hours, with nausea, vomiting, back pain, and pain to the groin. Testicular torsion, which was listed among the possible clinical impression box as a possible cause of abdominal pain, was not annotated or

[1] 1. Davis JE, Silverman M. Scrotal Emergencies. Emergency Medicine Clinics of North America 29(2011) 469-484. DOI:10.1016/j.emc.2011.04.011

2. Harrison's Principals of Internal Medicine, 18th Edition, 2012, Chapter 13, page 109, Table 13-1, "Some Important Causes of Abdominal Pain".

3. Rosen's Emergency Medicine concepts and Clinical Practice, 5th edition, 2002, Chapter 27, Box 27-1, page 225.

4. Markovchick: Emergency Medicine Secrets, 5th edition, 2010. Chapter 34 – Bowel Disorders, Table 34-1 "Differential Diagnosis for Right Lower Quadrant Abdominal Pain". Page 241.

5. McNamara R, Dean AJ. Approach to Acute Abdominal Pain. Emergency Medicine Clinics of North America 29(2011): 159-173. Doi:10.1016/j.emc.2011.01.013.

6. Wampler SM, Llanes M. Common Scrotal and Testicular Problems. Primary Care Clinics of Office Practice 27(2010): 613-626. Doi:10.1016/j.pop.2010.04.009.

5

listed in the differential diagnosis.

c. Failure to perform a testicular/genital examination. The record indicates that Dr. Harvey Castro examined the patient twice on March 12, 2014, and on both times he failed to do a testicular examination. The standard of medical care indicates that any male of Mr. Martinez-Gonzalez's age presenting with unexplained abdominal pain should have a complete abdominal and testicular examination.

d. Failure to recognize the need for further diagnostic studies, such as a testicular ultrasound and prompt urology consultation. An ultrasound is the appropriate test to rule out testicular torsion for any male that presents to an emergency room with abdominal pain, flank pain, nausea, and vomiting to rule out testicular torsion. By failing to order the appropriate diagnostic testing, instead of receiving a Doppler ultra sound to rule out testicular torsion, Dr. Castro ordered a CT scan, which led to the delay in the diagnosis and treatment of the patient.

e. Failure to re-exam the patient after the CT scan. The physician's notes indicate that a reexamination was done, but fails to address whether or not Dr. Castro could palpate the umbilical hernia, or whether pressing on the hernia elicited pain similar to those for which the patient was complaining. Most umbilical hernias on CT do not cause pain, so it was required of Dr. Castro to palpate the hernia and prove that this was the cause of the patient's symptom of pain.

f. Failure to properly document the patient's symptoms. Dr. Castro failed to appropriately examine Mr. Martinez-Gonzalez and failed to do a complete examination based on the chief complaint, evidenced by the fact that the "ABDOMEN/GU" area on the physician notes appears incomplete.

g. Failure to give the patient appropriate instructions for follow up

13. The specific actions that the Elite Care staff should have undertaken on 03/12/14, to comply with the standard of care that would have prevented the subsequent complications are as follows:

a. Had Dr. Castro and the Elite staff properly documented the patient's symptoms, they would have ordered appropriate tests and referred the patient emergently for the treatment of testicular torsion of Mr. Martinez-Gonzales.

b. Had Dr. Castro complied with the minimum standard of care, Mr. Martinez-Gonzalez would have been appropriately diagnosed and treated, where the minimum standards called for a complete physical exam of the genitals of a male patient presenting with sudden onset of pain radiating to the groin,

6

right flank pain, vomiting, and nausea. Had this been done, the patient would not have lost his right testicle due to torsion.

c. Had Dr. Castro performed a complete physical exam, he could have been properly diagnosed and Dr. Castro could have initiated actions to effect detorsion of Mr. Martinez-Gonzalez's testicle to attempt to salvage his right testicle.

d. Had Dr. Castro appropriately diagnosed Mr. Martinez-Gonzalez, it would not have led to the delay in the diagnosis and treatment of the patient and he would not have been discharged with the wrong diagnosis.

e. Had Dr. Castro re-examined Mr. Martinez–Gonzalez, he could have palpated the umbilical hernia, or pressed on the hernia to see it the patient elicited pain similar to those for which the patient was complaining of when he came in.

f. Had Dr. Castro and the Elite Care staff properly documented Mr. Martinez-Gonzalez's symptoms, they would have taken a complete history and physical exam that would have properly diagnosed him.

g. Had Elite Care's staff given Mr. Martinez-Gonzalez appropriate follow up instructions, he likely would have sought immediate medical care in time to salvage his right testes.

14. The specific actions that the providers at Elite Care failed to perform on 03/13/14, and therefore breached the standard of care are:

a. Failure to admit Mr. Martinez-Gonzalez and perform a medical screening to determine if an emergency medical condition existed. Elite Care concedes that Gonzalez returned to the same Elite Care facility specifically complaining of groin/testicular pain. Martinez-Gonzalez complained of severe pain and presented with the same symptoms of groin pain and right flank pain. The symptoms were clearly consistent with the diagnosis of testicular torsion with a strong potential to progress to nonviable testes if not rapidly treated. This diagnosis was completely ignored.

b. Failure to take all reasonable steps to secure the patients written consent to refuse treatment or transfer. Dr. Castro did not even offer to transport the patient, knowing his condition. Pursuant to Tex. Admin. Code §131.66 (a) (8):

"The facility's policy [in a standalone emergency room] shall require that all reasonable steps are taken to secure the written informed consent of a patient, or of a person acting on a patient's behalf, when refusing a transfer or related examination and treatment. Reasonable steps include:

7

(A) a factual explanation of the increased medical risks to the patient reasonably expected from not being transferred, examined, or treated at the transferring hospital;

(B) a factual explanation of any increased risks to the patient from not effecting the transfer; and

(C) a factual explanation of the medical benefits reasonably expected from the provision of appropriate treatment at another hospital.

(D) The informed refusal of a patient, or of a person acting on a patient's behalf, to examination, evaluation or transfer shall be documented and signed if possible by the patient or by a person acting on the patient's behalf, dated and witnessed by the attending physician or facility employee, and placed in the patient's medical record."

c. Elite Care failed to provide an explanation of medical risks of not timely evaluating and treating his groin pain, failed to obtain informed consent of failure to transfer the patient, and failed to document the patient's refusal in the patient's medical record.

d. Failure to make any attempt to stabilize the patient before discharging him. Dr. Castro failed to at a minimum to offer or perform a prompt physical/medical examination of Gonzales to confirm torsion. He also failed to attempt a manual detorsion of the testicle. Instead of admitting Gonzales and attempting to physically perform a detorsion maneuver on the patient, Dr. Castro did not properly evaluate and recognize the extreme risks presented to the patient's health

e. Failure to coordinate an appropriate transfer to a nearby hospital with surgical capabilities. Dr. Castro failed to at a minimum arrange emergency medical transportation to Parkland or the closest medical facility with surgical capabilities.

15. The specific actions that the Elite Care staff should have undertaken on 03/13/14, to comply with the standard of care that would have prevented the subsequent complications are as follows:

a. Had Martinez-Gonzales been admitted as a patient and a medical screening was performed to determine if an emergency medical condition existed, the patient could have been stabilized and his testes could have been salvaged. Also Dr. Castro could have called ahead to the nearest surgical hospital and transferred the patient for prompt treatment rather than the patient driving himself to the hospital.

b. Had Elite Care's staff taken all reasonable steps to provide the patient with the medical risks of not being transferred and secured the patient's written consent to

8

466

refuse treatment, then Elite care would have documented this and the patient would have been aware of his rights.

c. Had Dr. Castro and the Elite Care staff stabilized the patient before discharging him, the patient would have had a proper medical assessment about the condition of the patient's wellbeing to determine if an emergency medical condition existed and his testes could have been salvaged.

d. Had Elite Care's staff coordinated an appropriate transfer to a nearby hospital, the patient would not have had to drive himself to the hospital in pain to remove his nonviable testes and salvage may have still been possible.

16. The standards of care applicable to Elite Care in rendering care in the emergency department to Mr. Martinez-Gonzalez, on 3/12/14 and 3/13/14 are, not limited to the following:

a. Elite Care failed to have in place a procedure or protocol (or failed to follow such protocols if in existence) that would implement timely emergency medical care for an individual complaining of testicular pain and procedures in place to "stabilize" the patient by providing examination and appropriate transfer.

17. There is a pathology and causation link between the breach and the violation of the standard of care by Dr. Castro and Elite Care staff, and Elite Care.

a. I strongly believe that the records demonstrate that Harvey Castro MD's failure to recognize and act upon critical findings from Mr. Martinez-Gonzalez's signs, symptoms and complaints, as well as his failure to recognize the need for further diagnostic studies, such as a testicular ultrasound and prompt urology consultation, led to the delay in the diagnosis and treatment of Mr. Martinez-Gonzalez's acute testicular torsion and resulting injuries and damages.

b. Had Harvey Castro MD diagnosed, treated and provided medical care, he would have, in reasonable medical probability, recognized that Mr. Martinez-Gonzalez required further radiological testing and prompt urological consultation. Had the proper examination been performed and proper steps taken, Mr. Martinez-Gonzalez would have undergone prompt surgical correction of his testicular torsion.

c. The failure of Harvey Castro MD to meet the applicable standards of medical care certainly caused or contributed to the loss of his right testicle and damages to Mr. Martinez-Gonzalez. Testicular torsion requires immediate recognition and management, as the testicle is not receiving adequate blood flow. Studies clearly demonstrate that testicular salvage after torsion is extremely time dependent (See Reference 1,6). The misdiagnosis and mismanagement directly led to Mr. Martinez-Gonzalez's loss of his right testicle. Delay in the appropriate care of this patient was the direct result of a failure to properly evaluate and exclude the

9

diagnosis of acute testicular torsion and the failure to obtain prompt urological consultation.

d. Failure to evaluate the patient for testicular torsion on physical exam, failure to order an emergency scrotal ultrasound directly resulted in the patient not receiving prompt emergency urological care to salvage his testicle. It is my opinion that the delay in performance of the proper studies and diagnosis were the direct cause of this patient's poor outcome. Furthermore, Elite Care's failure to properly complete a medical exam on March 12, 2014 and timely screen this patient on March 13, 2014, demonstrates a recklessness and conscious disregard of the patient's health and welfare, which supports gross negligence, and constitutes willful and wanton negligence.

e. Moreover, it is the responsibility of the medical facility to ensure that procedures are in place and strictly followed for the recognition and treatment of patients with serious, time-sensitive emergency conditions such as testicular torsion, which Elite Care also failed to do.

18. Further, I am making the assumption that the following definitions are correct for the purpose of furnishing additional opinions regarding the conduct of Harvey Castro MD in the diagnosis, care and treatment of Mr. Martinez-Gonzalez. These are as follows:

☐ "Negligence" with reference to the conduct of Harvey Castro MD means the failure to use ordinary care; that is, the failure to do that which an emergency medical health care provider would have done under the same or similar circumstances or doing that which an emergency medical nurse and an Emergency Medicine health care provider of ordinary or reasonable prudence would not have done under the same or similar circumstances.

☐ "Ordinary Care" with reference to the conduct of Harvey Castro MD means that degree of care that an emergency medical nurse and an Emergency Medicine health care provider of ordinary or reasonable prudence would use under the same or similar circumstances.

☐ "Proximate Cause" with reference to the conduct of Harvey Castro MD means that which is a natural and continuous sequence, produced an event, and without such an event would not have occurred; and that an emergency medical nurse and an Emergency Medicine health care provider exercising ordinary care would have foreseen that the event or some similar event, might reasonably result therefrom. There may be one or more proximate causes of an event.

☐ "Gross negligence" with reference to the conduct of Harvey Castro MD means an act or omission:

a. which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual,

10

468

subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. (C) "Willful and wanton negligence" with reference to the conduct of Harvey Castro MD is the same as "gross negligence" as defined above.

19. In my opinion, and assuming the above definitions of "negligence", "ordinary care", "proximate cause", "gross negligence" and "willful and wanton negligence" with respect to Harvey Castro MD's obligation to follow such standards of reasonable, prudent and accepted medical care required for an emergency medical physician in the care of Mr. Martinez-Gonzalez as discussed above was negligence, gross negligence and willful and wanton negligence; and this negligence, gross negligence and willful and wanton negligence was a proximate cause of the injuries and damages to Mr. Martinez-Gonzalez.

20. As stated, the literature indicates that there is a condition known as intermittent torsion, whereby the torsion is only partial, and can spontaneously detorse, or retorse, causing intermittent pain. In this situation, it is possible for testicle to be viable up to 24 hours, or more. There are cases of patients that have had intermittent torsion for several days and still have viable testicles. However, because no ultrasound was ordered or taken at Mr. Martinez-Gonzalez's initial evaluation, we cannot know with 100 percent certainty as to whether intermittent torsion was present. However, the medical records from Elite Care indicate that "waxing and waning" was present upon his initial visit. Waxing and waning is correlated with intermittent torsion. Ultrasound would indicate whether diminished blood flow was present in the testicle. With waxing and waning, or intermittent torsion with blood flow running through testicle, the testicle could have lasted 24 hours, or more, but the number of days is not known because Dr. Castro failed to perform an ultrasound at the patient's initial visit.

21. Looking at the totality of the circumstances, Dr. Castro's conduct on March 12, 2014 was willful and wanton negligence. When any male presents with right or left abdominal pain, it is imperative to rule out testicular torsion. This is taught in all residencies and in all emergency medicine textbooks. Moreover, Dr. Castro as a physician practicing emergency medicine has to practice by the standards of emergency medicine. Standard emergency medicine requires an emergency doctor to perform a complete physical exam in any male presenting with abdominal pain to rule out torsion. As an emergency room physician, Dr. Castro was required to comply. His failure to perform a genital physical exam when Mr. Martinez-Gonzalez presented with groin pain, abdominal, nausea, vomiting, and flank pain represents willful and wanton negligence. Dr. Castro admits in his affidavit that Martinez-Gonzalez presented with abdominal, flank pain, nausea, and vomiting. Martinez-Gonzalez also contends that he complained of inner thigh/groin pain. Even if Martinez-Gonzalez was only complaining of right lower quadrant pain, a testicular exam was still mandatory. Dr. Castro should have been actually aware of the peril and risk of injury to a patient that walks in to the emergency room with symptoms of groin, abdominal, flank pain, nausea and vomiting, and immediately have recognized them to be signs and symptoms of testicular torsion. At a minimum, any male presenting to the emergency room with abdominal and flank pain, regardless of groin pain, should be provided with a Genital Exam. Despite the risk of harm, Dr. Castro chose to proceed

11

**469**

with conscious indifference. Dr. Castro did not even fill out or complete the GENITAL EXAM portion of the physician record. As stated, testicular torsion is a common enough cause of abdominal pain that it is listed in the most common diagnosis of the assessment box of the Elite Care Emergency Physician Record, but Dr. Castro completely skipped over the assessment, and failed to complete the exam. Dr. Castro also failed to order an ultrasound despite being aware of the Martinez-Gonzalez's classic symptoms of testicular torsion, or seek urological consultation. Dr. Castro also failed to re-examine Mr. Martinez-Gonzalez after ordering a CT scan to see if he could palpate the umbilical hernia, or press on the hernia to see if the patient elicited pain similar to those for which the patient was complaining of when he came in or arrived.

22. The standard of care, given the history and circumstances under which Mr. Martinez-Gonzalez presented to Elite Care on March 12, 2014, required a thorough physical examination including a testicular examination. Elite Care's medical records indicate that on March 12, 2014, Dr. Castro examined Martinez-Gonzalez on two separate occasions. The records do not indicate that Dr. Castro did a testicular examination on this date. The standard of medical care indicates that any male of Mr. Martinez-Gonzalez's age presenting with unexplained abdominal pain should have a complete abdominal, testicular examination. Testicular conditions can have referred pain to the abdomen and since the cause of Mr. Martinez-Gonzalez's abdominal pain had not been elicited, a testicular examination should have occurred before discharge. Failure to perform a complete testicular exam, failure to order an ultrasound or obtain urological consultation, failure to physically reexamine the patient after CT scan, and failure to complete Elite Care's own GENITAL exam assessment before discharge of this patient represented an extreme degree of risk and a complete conscious disregard of the patients safety, health, and welfare

23. Moreover, Dr. Castro's actions on March 13, 2014, implicates his actions on March 12, 2014, showing Dr. Castro was aware of the risk but nevertheless chose to proceed with conscious indifference to the rights, safety, or welfare of Mr. Martinez-Gonzales. Dr. Castro and Elite Care admit Mr. Martinez-Gonzalez returned to Elite care, but claim he refused to check in because did not want to incur cost for an EMS bill in arranging transfer. Dr. Castro and Elite Care's claims and conduct were a direct violation of the Texas Administrative Code 131.46 (a) and 131.66 (a)(8)-(9). Specifically, Elite Care and Dr. Castro were required by law to provide a free medical screening to Mr. Martinez-Gonzalez regardless of cost to rule out an emergency condition, stabilize him, and offer free transfer arrangement to a hospital with surgical capabilities based on his medical condition, irrespective of cost pursuant to the Texas Administrative Code. Notwithstanding, even if the patient refused to check in, Dr. Castro and Elite care were required by law to document the patient's refusal. This is the law free standing clinics and practitioners in free standing clinics must be aware of.

24. As such, even if Defendants contend that Mr. Martinez-Gonzalez refused care in order to avoid cost of an EMS bill, there is absolutely no evidence in the medical records, that Elite Care or Dr. Castro advised him of the emergency condition, risks of refusal, risks and benefits of transfer, or obtained informed consent pursuant to Texas Administrative

12

470

Code 131.46 (a) and 131.66 (a)(8)-(9) or that they advised him that they could offer a free medical screening to rule out torsion or any other potential life threatening condition. Defendants were legally responsible for a free medical screening, and at a minimum should have screened, checked Martinez-Gonzalez in to the facility, charted his symptoms, ordered an ultrasound, and arranged free transfer to another facility with surgical capabilities.

25. There is no evidence in the medical record on file, that Mr. Martinez-Gonzalez on March 13, 2014, signed or indicated that he refused care as alleged, based on informed consent, pursuant to the Texas Administrative Code. As such, it was a violation of the Texas administrative code, and constituted willful and wanton conduct/gross negligence to not provide screening, examination, and/or arrange transfer on March 13, 2014, knowing the peril and injury that could have been caused without stabilization of his emergency medical condition. Clearly, delay in diagnosis worsens outcomes. Mr. Martinez-Gonzalez testicle could possibly have lasted more than 24 hours, but the amount of blood flow could not be confirmed because Dr. Castro failed to perform an ultrasound on either day. Here, because an ultrasound was not performed on either day, we don't if his testicle could have lasted 24 hours or more. Defendants should have known and understood peril. Failure to provide free medical screening, examination, treatment, and arrange transfer, irrespective of cost, constituted a complete and total conscious disregard for Mr. Martinez-Gonzalez's health, safety, and welfare.

26. Had Elite Care staff acted per the standard of care, then within reasonable medical probability Mr. Martinez-Gonzalez would not have been improperly diagnosed. Testicular torsion would have been properly diagnosed and emergent treatment would have been administered to salvage his right testicle. He likely would have avoided the removal of his right testes due to non-viability, and his chances of fertility and fathering children would have been greater. The actions and inactions of Elite Care's staff were the proximate cause of the progression to testicle non-viability resulting in removal of Mr. Martinez-Gonzalez's right testicle. Their actions directly lead to this outcome, which was foreseeable. Elite Care failed to have in place proper procedures (or following those procedures/protocols) that would implement timely emergency medical care for Mr. Martinez-Gonzales. Further, Dr. Castro failed to timely diagnose and treat Mr. Martinez-Gonzalez's serious testicular torsion medical condition in a timely manner, as his condition deteriorated within their facility because of the missed diagnosis. These acts and omissions constitute departures from the standard of care. These departures from the standard of care proximately caused Mr. Martinez-Gonzalez's injuries, including non-viability of his right testes requiring surgical removal.

27. Further, "Affiant sayeth not."

13

471

Executed: February 7th, 2017



Dr. William Gibson, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME ON THIS 7th day of Feb 2017

By Dr. William Gibson, M.D., who has stated to me that the forgoing affidavit and statements contained herein are true and correct within her personal knowledge, to certify which witness my hand official seal of office.

Notary Public In and for the State of Texas

SAUL HERNANDEZ
(Seal Here)
Notary Public
STATE OF TEXAS
My Comm. Exp. 05-14-18

14

472